[No. S046382. Aug. 29, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN ARTHUR MINIFIE, Defendant and Appellant.

## COUNSEL

David D. Carico for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias, Richard Rochman and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

CHIN, J.—A defendant charged with assaultive crimes who claims self-defense may present evidence that the alleged victim had previously threatened him. Here, we decide the admissibility of threats against the defendant, not by the *victim*, but by *third parties*. We conclude that evidence of third party threats is admissible to support a claim of self-defense if there is also evidence from which the jury may find that the defendant reasonably associated the victim with those threats.

In this case, the trial court excluded substantial evidence of third party threats. The Court of Appeal held the exclusion to be error and found it prejudicial as to most of the counts. We agree.

## I. THE FACTS

### A. *Prosecution Case*

The incident underlying this case occurred in the crowded Antlers Bar in Pinole around midnight on November 29-30, 1992. Aukusitino Afamasaga (Tino) was sitting at a table with several others when defendant, a convicted felon, entered the bar. Tino, a large man, had a broken foot covered by a cast and was using crutches. He was unarmed. Tino testified that he did not know defendant by sight, but someone pointed defendant out to him. Tino disliked defendant because he had killed Tino's friend, Jackie Knight. Tino had been a pallbearer at Knight's funeral. Defendant and Tino made eye contact, and then approached each other.

They spoke briefly. Tino asked if defendant knew who Tino was. Defendant replied that he did. Tino said, "So it was you?" Then Tino punched

defendant in the face, knocking him to the floor on his back. Tino's crutches fell, and he turned to grab them. Defendant pulled a gun from his waist area and fired at Tino, hitting three fingers of his right hand. The bullet also hit another patron, Darrell Nordahl, passing completely through his thigh. Tino dove to the floor, crawled to the door, and ran out. Defendant followed Tino, firing a second shot at him from inside the bar and at least a third shot outside. Defendant then fled, successfully eluding the pursuit of a passing police officer.

Defendant's gun was found the next day outside a residence. One spent cartridge fired from that gun was found inside the bar and two more outside. Defendant surrendered to the police on December 9, 1992. Three fingers of Tino's right hand were fractured. The treating physician described Nordahl's wound as "serious." Both Tino and Nordahl underwent surgery.

### B. *Defense Case*

Defendant claimed he acted in self-defense. He presented evidence to support the defense and made an offer of proof of additional evidence that the trial court excluded.

### 1. *The Offer of Proof and the Court's Rulings*

The Court of Appeal opinion, authored by Justice Perley, describes the offer of proof and the trial court's rulings: "Before trial [defendant] submitted a written offer of proof as follows: 'Sgt. Celestre of the Contra Costa County Sheriff's Department will be called to the stand to testify that the Knight family of the Pinole area has a reputation for violence, a reputation for making threats with the means of carrying them out and a reputation for being extremely dangerous. The Knight family and friends are found in and out of [jail and] prison.' The offer of proof explained the relevance of this reputation evidence to [defendant's] theory of self-defense, in light of the other evidence to be presented by the defense at trial.

"The defense evidence was to include testimony that after [defendant] killed Jackie Knight, he had 'been threatened both directly and indirectly. [Defendant] spent time in prison (and jail awaiting prison) for an unrelated [Penal Code section 245] (the prior violent felony). He received an attack in jail while awaiting the plea bargain that landed him in prison. He received threats in prison. His wife heard of threats from friends of the Knights.' The defense was further prepared to prove that [defendant's] visits to his in laws 'were always in secret. He was afraid of the Knights finding out where he was. He was scared that he would be killed. On the night of the shooting,

defendant was in town because his close friend Anthony Davis had been killed by a friend of the Knights. . . . [¶] [Defendant] knew Tino by sight. He knew Tino was a very close friend of Jackie Knight. He knew Tino had a reputation for violence. He was scared of Tino and associated Tino with the Knight crowd.'

"The offer of proof concluded: 'Since [defendant] killed Jackie Knight in self-defense, since Tino was one of Jackie's pallbearers, since [defendant] had received threats ever since Jackie's shooting from family and friends of the Knights, Sgt. Celestre should be able to testify that the Knight family and friends have a propensity for violence, are extremely dangerous, and have a reputation for making threats and carrying them out.'

"[Defendant's] position was further elaborated at a hearing outside the presence of the jury. Defense counsel explained that Sergeant Celestre's testimony about the Knight family and friends would be 'very brief . . . probably three or four questions. . . . [¶] And specifically I'm talking about in the Knight family Charles Knight, Joey Knight, and the infamous twins, Jess and Jeff Knight. . . . The whole family is in and out of prison constantly. But the main thing is do they have a propensity for violence in the community, they and their friends? . . . [¶] [Defendant] is threatened by members and friends of the Knight family. You have to understand that the Knight family is the—I think . . . Detective Hale said the Knight family is the meanest, baddest family in West County. [¶] So friends—he was threatened by friends. . . . Steve's wife received threats, both directly and indirectly, . . . words to the effect "We're going to get Steve." So Steve is living in fear . . . .'

"Defense counsel continued: '. . . I really need to bring in the fact of all these threats to create the reason why Steve was afraid and why he wanted to leave the bar and actually why he did what he did. Normally a juror might think, "Well, if Steve was punched by a bar patron—" I mean if they don't hear about all this stuff, they're going to think, "Well, Tino was just a bar patron and he was a pallbearer in the Jackie Knight case, and that's it. So he punched Steve once." [¶] Then he reached back for his crutch, and maybe they would think that—if they didn't hear about all the fear that Steve was undergoing of the Knights and Tino, then they might think that Steve acted excessively when he pulled out the gun and when he fired a shot in the direction of Tino. And they might think that, "Well, Steve acted excessively because he had no reason to. He should have just—" maybe he should have just crawled out the front door. That's the reason, and it goes right to the core of my case. . . . I've prepared the case around this.'

"The trial court excluded evidence of the violent reputation of the Knight family and friends. The court concluded that this evidence was inadmissible

under the statutes on character evidence (Evid. Code, § 1100 et seq.) and that, even if the evidence was admissible under these statutes, it should be excluded under Evidence Code section 352 as substantially more prejudicial than probative. The court reasoned that an undue amount of time would be consumed identifying the Knights' friends and the group's violent acts, and that such evidence would tend to confuse the jury. The court also ruled that the defense would be precluded from presenting evidence of threats against [defendant] from anyone other than Tino. The defense conceded that Tino had never previously threatened [defendant].

"Consistent with these rulings, the court sustained the prosecutor's objections when [defendant] attempted to testify that his life had been threatened. [Defendant] was prevented from testifying that his friend Davis had been murdered by a friend of the Knight's [sic], and the jury was instructed to disregard [defendant's] testimony that, after Davis' murder, he had received a phone call saying 'I was next.' "

### 2. *Evidence the Defense Presented*

Defendant's wife testified that he had been in prison from April 1990 to November 1991. Before the prison stint, they had lived in El Sobrante. After defendant's release, they moved to Pleasanton "to start a new life," but occasionally visited the El Sobrante area. On the weekend in question, they were in that area for a family function and to attend the funeral of their friend, Anthony Davis. (The witness was not allowed to testify who "killed" Davis.) Around 12:30 a.m., the night of the shooting, defendant's wife received a telephone call from defendant, and she picked him up. His nose was bloody and "pushed to one side." The two drove to a motel in Fremont, where they stayed for over a week.

Defendant testified that he pleaded guilty to charges of assault with a deadly weapon in 1990 and spent 22 months in prison. Before he went to prison, he also fatally shot Jackie Knight, although he was never prosecuted for the incident. Defendant was afraid of "the whole . . . Knight crowd." After he got out of prison, he lived in Pleasanton and considered himself "in hiding." He came to West Contra Costa County occasionally to visit his "in-laws," but would not tell anyone when he did. The weekend of the shooting, he was in the area for the "viewing" of the body of his close friend, Anthony Davis. He and a friend went to the Antlers Bar for a drink. He was carrying a gun, which he had obtained from Davis, "as a precaution of what happened to" Davis. When he entered the bar, defendant spoke briefly with another friend. Then he glanced up and saw Tino.

Defendant recognized Tino as a friend of Jackie Knight's. He knew that Tino had been a pallbearer at Knight's funeral. Tino was staring at him "like

if looks could kill, I'd be dead." Defendant decided he should leave and walked towards the door, passing near Tino. Tino stepped towards him, put his hands in the air, and said, "What's up?" Tino asked if defendant knew who he was, and defendant said he did. Then, without warning, Tino hit him in the face. Defendant fell to the ground "very dazed." He saw Tino bend over and grab a crutch. Defendant "shot in [Tino's] direction" because he "knew" from the way Tino grabbed the crutch "that he was going to hit me in the head with" it. Defendant fled. He did not see Tino leave the bar.

Outside, defendant began running to his car when he again saw Tino. He heard Tino say something "about the car," and, in reaction, defendant "shot twice in the air." He then ran from the area, losing the gun along the way, and called his wife from a drugstore. She met him, and they went to Fremont. Defendant eventually turned himself in to the police. He testified he fired the gun because he "feared for my life." If he hadn't fired, Tino "would have got me for sure."

The defense also presented evidence about the extensive injury defendant suffered when Tino hit him.

### C. *Procedural History*

A jury convicted defendant of one count of possession of a firearm by a felon (Pen. Code, § 12021), and two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(2)), with enhancements for use of a firearm (Pen. Code, § 12022.5) and infliction of great bodily injury (Pen. Code, § 12022.7). The court found that defendant had a prior serious felony conviction. (Pen. Code, § 667, subd. (a).) It sentenced defendant to state prison for 12 years. The Court of Appeal concluded the trial court erred in excluding the proffered defense evidence and reversed the assault convictions. Finding the error harmless as to the conviction for possession of a firearm by a felon, it affirmed that portion of the judgment.

We granted the Attorney General's petition for review.

### II. DISCUSSION

#### A. *Admissibility of Evidence of Third Party Threats*

"To justify an act of self-defense for [an assault charge under Penal Code section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him. [Citation.]" (*People v. Goins* (1991) 228 Cal.App.3d 511, 516 [279 Cal.Rptr. 42], italics in original.) The threat of bodily injury must be imminent (*In re Christian S.* (1994)

7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574]), and ". . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]" (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 966 [4 Cal.Rptr.2d 765, 824 P.2d 571]; see also *People* v. *Clark* (1982) 130 Cal.App.3d 371, 380 [181 Cal.Rptr. 682]; Civ. Code, § 50 ["Any necessary force may be used to protect from wrongful injury the person . . . of oneself . . . ."]; Pen. Code, §§ 692 ["Lawful resistance to the commission of a public offense may be made: [¶] 1. By the party about to be injured . . . ."], 693 ["Resistance sufficient to prevent the offense may be made by the party about to be injured: [¶] 1. To prevent an offense against his person . . . ."].)

In *People* v. *Humphrey* (1996) 13 Cal.4th 1073, 1082-1083 [56 Cal.Rptr.2d 142, 921 P.2d 1], we considered the reasonableness requirement in the context of a murder charge. We concluded that, although the test is objective, reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might " 'expect[] to operate on [defendant's] mind . . . .' [Citation.]" (*Id.* at p. 1083.)

The parties agree that evidence the *victim* had threatened defendant would be admissible to support a claim of self-defense. (E.g., *People* v. *Moore* (1954) 43 Cal.2d 517, 527-529 [275 P.2d 485]; *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1188 [264 Cal.Rptr. 167].) As the Attorney General states, "Common sense and experience tell us that it is reasonable for a person threatened by another to be on heightened alert upon encountering that threatener, and to reasonably take [the threat] into account in deciding the necessity for, and the amount of, defensive action, in response to any act on the part of the threatener reasonably appearing to be calculated to carry out that threat."

■ The disputed issue is whether, as the Court of Appeal stated, "evidence of threats is . . . admissible where the threats have not been made by the victim, but by members of a group who in the defendant's mind are reasonably associated with the victim." ■ The Court of Appeal concluded the evidence is admissible for reasons with which we agree, and which we adopt as our own:

"A person claiming self-defense is required to 'prove his own frame of mind,' and in so doing is 'entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear.' (*People* v. *Davis* [(1965) 63 Cal.2d 648, 656 (47 Cal.Rptr. 801, 408 P.2d 129)].) The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an

individual may color a person's perceptions of that individual. A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence 'tend[ing] in reason to prove' that the fear was reasonable. (Evid. Code, § 210 [defining relevant evidence].) Threats from the group on the defendant's life would certainly tend in reason to make the defendant fearful. This is especially true where the group has a reputation for violence, and that reputation is known to the defendant. Such threats are relevant to the defendant's state of mind—a matter 'of consequence to the determination of the action' (*ibid.*)—and the trier of fact is entitled to consider those threats along with other relevant circumstances in deciding whether the defendant's actions were justified.

"This conclusion is consistent with commentaries on the subject (see Kadish, *Excusing Crime* (1987) 75 Cal.L.Rev. 257, 275; Comment (1937) 25 Cal.L.Rev. 459, 465), and with the decision in the case of *People* v. *Lee Chuck* (1887) 74 Cal. 30 [15 P. 322]. Lee Chuck was charged with murder in the shooting of Yin Yuen. They were members of rival gangs. Lee Chuck's defense was that he shot at Yin Yuen in self-defense, after the latter shot at him. The eyewitness testimony was conflicting. Lee Chuck was convicted of murder, and the judgment was reversed on appeal. The opinion of the California Supreme Court reads in relevant part as follows:

" 'It appeared from the evidence of the prosecution that, at the time of the homicide, Lee Chuck was incased in a steel coat-of-mail, and was armed with four pistols. These were brought in and displayed before the jury. They were intended to have, and doubtless did have, great weight in convincing the jury that Lee Chuck had prepared himself for the deadly encounter in which Yin Yuen lost his life. To explain this fact, and to show that the defendant had reason to think his life in danger, and for that reason, and not to prepare himself to make a murderous assault upon the deceased, defendant put on a coat-of-mail and armed himself, the defense offered to show that the Bo Sin Sear society and another organization of which Yin Yuen was a member, had threatened to take the life of defendant, and that defendant had been informed of the fact. This evidence was objected to as incompetent, and the objection was sustained.

" 'This ruling cannot be maintained. The fact of the extraordinary armor worn by the defendant at the time of the homicide was important evidence for the prosecution. To refuse to permit the defendant to show that the preparation was for a different purpose, and for reasons which implied no intent to assault the deceased, was a denial of a most essential right.' (*People* v. *Lee Chuck, supra,* 74 Cal. at pp. 34-35.)

"The circumstances of [defendant's] case are analogous to those in *Lee Chuck.* [Defendant] was precluded from showing that he was armed at

the time of the incident because his friend had been killed by a member of the 'Knight crowd,' and he had received a threat that he 'was next.' Here, as in *Lee Chuck*, exclusion of evidence of the antecedent threats limited the defendant's 'essential right' to argue that his actions were justified.

"*Lee Chuck* establishes that under California law evidence of threats from the victim's associates may be used in support of a claim of self-defense 'to show that the defendant had reason to think his life in danger.' (*People* v. *Lee Chuck, supra*, 74 Cal. at p. 34.) Accordingly, [defendant] and his wife could properly testify to the threats they received after Jackie Knight's killing, not only to show why [defendant] was armed on the evening in question, but also to indicate what reasonably might have been going through his mind when he lay dazed on the barroom floor and saw his assailant reach for a potentially deadly weapon. The jury was required to focus on his state of mind at that instant in judging whether he had used only the 'force and means . . . which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appear[ed] to be imminent.' (CALJIC No. 5.30 (5th ed. 1988).) [Defendant] was 'entitled to corroborate his testimony that he was in fear of his life' (*People* v. *Davis, supra*, 63 Cal.2d at p. 656) with evidence of threats from the Knight crowd, and with evidence of their reputation for violence. The character evidence, no less than the evidence of threats, tended to show that [defendant's] apprehension of great bodily harm was reasonable.

"The trial court erred insofar as it reasoned that evidence of the Knight crowd's reputation for violence was inadmissible under Evidence Code section 1101. This statute only limits the use of character evidence to 'prove . . . conduct on a specific occasion.' (Evid. Code, § 1101, subd. (a).) This limitation is irrelevant because the group's reputation was offered to explain [defendant's] state of mind, rather than to prove Tino's actual intentions. Moreover, the statute does not limit 'the admissibility of evidence offered to support or attack the credibility of a witness' (Evid. Code, § 1101, subd. (c)), and evidence of the group's reputation for violence lent credibility to [defendant's] claim that he lived in fear of them."

The Attorney General argues that the reason for admitting earlier threats by the victim (and supporting evidence of the victim's reputation for violence) "disappears where the threat is made by a third party. Absent a showing that the defendant has reason to believe the victim has himself adopted the threat, third-party threats should be inadmissible to support the objective reasonableness of self-defense." The reason for this rule, according to the Attorney General, is that "One who personally threatens another, or one who adopts that threat or acts jointly with the threatener in attacking the

victim, has by his own actions subjected himself to a quicker and harsher self-defense response on the part of the person threatened. The threatener is in no position to protest or claim unfairness when the threatened person legitimately 'overreacts,' as the 'overreaction' was the result of the threatener's own doing and legitimized by conduct within the threatener's control. [¶] The same is not true for third parties who do not adopt the threats of others or jointly participate in the threatener's attack. These third parties are no different than anyone else involved in a confrontation giving rise to a claim of self-defense. If the third party is the aggressor, the defendant may use the amount of force reasonable under the circumstances. The defendant may not, however, claim it was reasonable to use greater force based on unconnected threats of others. The third party has done nothing to cause the use of greater force and is entitled to the protections under the standard rules of self-defense."

 The flaw in this argument is that it assumes the law of self-defense centers on the *victim's* acts and intent. To the contrary, the law recognizes the justification of self-defense not because the victim "deserved" what he or she got, but because the defendant acted *reasonably* under the circumstances. Reasonableness is judged by how the situation appeared to the *defendant*, not the victim. As the Court of Appeal noted, "Because '[j]ustification does not depend upon the existence of actual danger but rather depends upon appearances' (*People* v. *Clark* (1982) 130 Cal.App.3d 371, 377 [181 Cal.Rptr. 682]; see also CALJIC No. 5.51), a defendant may be equally justified in killing a 'good' person who brandishes a toy gun in jest as a 'bad' person who brandishes a real gun in anger." If the defendant kills an innocent person, but circumstances made it reasonably appear that the killing was necessary in self-defense, that is tragedy, not murder. The test, therefore, is not whether the victim adopted the third party threats, but whether the defendant reasonably associated the victim with those threats.

The Attorney General also argues that admitting evidence of third party threats "focuses on the victim's status without any regard to the victim's relevant behavior." Third party threats, or even threats from the victim, however, do not *alone* establish self-defense. The victim's behavior is also highly relevant. There must be evidence the defendant feared imminent, not just future, harm. (*In re Christian S., supra*, 7 Cal.4th at p. 783.) Here, for example, Tino hit defendant in the face without apparent provocation or warning, and defendant testified he feared Tino was about to hit him with the crutch. There was thus evidence of aggressive behavior and imminence plus the proffered prior threats. The threats were relevant to illuminate, not replace, the other evidence supporting self-defense. We agree with the Court of Appeal that "At issue was [defendant's] state of mind *after* the punch,

when he pulled out his gun and shot at Tino. (See *People* v. *Aris, supra,* 215 Cal.App.3d at p. 1189 [justifiable homicide case turns on what the defendant actually and reasonably 'perceives in the victim's behavior at the moment of the killing'].) ■■■ Evidence of antecedent threats is admissible when the threats are followed by some 'overt act' that has placed the defendant in immediate danger. [Citations.] . . . [Defendant] was entitled to show how a reasonable person in his position would have evaluated the extent of that danger [posed by the punch]. 'In making that evaluation, the defendant is entitled to consider prior threats, assaults, and other circumstances relevant to interpreting the attacker's behavior.' (*People* v. *Aris, supra,* at p. 1189.)" (Italics in original.)

The Attorney General asks rhetorically, "May Salman Rushdie shoot any person of the Islamic faith, indeed anyone who reasonably appears to be a person of the Islamic faith, when that person reaches into a bulging pocket for a handkerchief?" That would be a question for a jury after considering all the circumstances of a specific case. The more pertinent question for our purposes is whether, if Rushdie were claiming self-defense, evidence of threats against his life would be *admissible* as part of the overall circumstances for the jury to consider. The answer is yes, if there was also evidence from which the jury could infer that the defendant reasonably associated the victim with those threats. (We note that this case involves an assault, not a homicide, and thus no question of *imperfect* self-defense is presented. [See *People* v. *Humphrey, supra,* 13 Cal.4th at p. 1082.] To support a claim of imperfect self-defense, evidence of third party threats may also be admissible if there is evidence the defendant actually, even if unreasonably, associated the victim with those threats.)

■■■ The Attorney General finally argues that allowing evidence of third party threats "encourages (or at least expands) the opportunities for the use of force on the part of defendants." To the contrary, the jury must still find the defendant's use of force was reasonable. In making this determination, it may give the evidence whatever weight it deems appropriate. We merely hold that the third-party-threats evidence is relevant, and the jury may consider it. (*People* v. *Humphrey, supra,* 13 Cal.4th at pp. 1088-1089.)

## B. *Evidence Code Section 352*

■■■ The trial court stated that even if the evidence were otherwise admissible, it would exclude it under Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"[O]f course, a defendant's evidence of self-defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 [only relevant evidence is admissible] and 352." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783.) Evidence of third party threats is relevant only if other evidence shows fear of imminent harm. (*Ibid.*) Even then its probative value may be slight. The Attorney General observes that fear due to threats from third parties is more "attenuated" than fear due to threats from the victim. The observation has merit; third party threats inherently carry less weight than threats from the victim. This attenuation does not justify excluding the evidence categorically, but it may be considered on a case-by-case basis. The more vague the threats, and the weaker the logical link between them and the defendant's actions, the more the court may be justified in excluding them. Similarly, evidence of a third party's reputation for violence may be particularly susceptible to exclusion. (See, e.g., *People* v. *Gonzales* (1967) 66 Cal.2d 482, 500 [58 Cal.Rptr. 361, 426 P.2d 929] [trial court properly determined that a third party's reputation for violence seven years previously "was too remote to have present probative value"].)

■ Rulings under Evidence Code section 352 come within the trial court's discretion and will not be overturned absent an abuse of that discretion. (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].)

Relying in part on "the nebulous nature of the alleged threats," the Attorney General argues the court did not abuse its discretion. To the contrary, the threat that defendant "was next" was decidedly concrete. According to defendant, one of Tino's group had just *killed* Anthony Davis, defendant's friend. We do not hold, of course, that all of the proffered evidence had to be admitted or that the court could not exercise control over its presentation, but we agree with the Court of Appeal that under the facts of this case, the court abused its discretion in excluding *all* evidence of third party threats:

"[Defendant] was entitled to present evidence of his circumstances so that the jury could see them from his point of view. He was entitled to argue that the perceptions of a reasonable person in his position would have been colored by the Knight crowd's threats and their reputation for violence.

"None of the considerations supporting the discretionary exclusion of relevant evidence substantially outweighed the probative value of the evidence at issue here. Presentation of evidence at the heart of the defense would not have represented an 'undue' consumption of time. There was no risk of prejudice associated with the evidence. 'The prejudice referred to in

Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] . . . and which has very little effect on the issues.' (*People* v. *Wright* (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106] [internal quotation marks omitted].) Evidence bearing on [defendant's] state of mind was highly probative, and had no 'unique tendency' to evoke any emotional bias against the prosecution. Evidence that [defendant] might have had reason to fear for his life would not have 'confused the issue.' It would have further illuminated the situation the jury was required to evaluate."

## C. *Prejudice*

■ The Court of Appeal found the error harmless as to the charge of possession of a firearm by a felon, and we agree. Defendant admitted entering the bar with a firearm, which established the offense. That he later may have acted in self-defense did not supply a defense to that charge. ■ The Court of Appeal also found the error prejudicial as to the other charges. Although the question is close, we agree with this conclusion also.

At its best, the claim of self-defense was not compelling. Defendant entered the bar armed with a handgun. Tino was the initial aggressor, but was not armed. Even viewing the defense in the most favorable light, the jury may well have found it unreasonable for defendant to react to the initial aggression by shooting in a crowded bar filled with innocent bystanders. On the other hand, the excluded evidence was central to the defense. Without it, defense counsel could argue to the jury only that Tino was a friend of a person defendant had killed, and defendant thought the unarmed Tino was about to hit him with a crutch. The excluded evidence would have strengthened the defense considerably: defendant could have argued that Tino's "crowd" had in fact killed his friend and threatened that defendant would be "next." The jury might find these circumstances justified a stronger reaction to Tino's punch than would otherwise be reasonable.

The jury argument of the district attorney tips the scale in favor of finding prejudice: "The defendant has tried to portray that he is scared to come back into West County. . . . [¶] . . . Again trying to create this aura that there is this big conspiracy, this big fear, this big threat out there that if Steve Minifie shows his face in West County, he's going to get hurt or killed. *There's been no evidence of that.* There has been this melodrama about it. There has been this aura cast out to you. [¶] There's no doubt that there's bad blood between Tino and Steve Minifie. . . . But to enhance it, to heighten it to the point that it fits into the *contrived* self-defense that they're trying to have you believe *is preposterous because it's not supported by the evidence.*" (Italics added.)

The reason there was "no evidence" and the "contrived" defense was "not supported by the evidence" is easily explained. The missing evidence was erroneously excluded. This argument demonstrates that the excluded evidence was not minor, but critical to the jury's proper understanding of the case. It is, therefore, reasonably probable the error affected the verdict adversely to defendant. (*People* v. *Humphrey*, *supra*, 13 Cal.4th at p. 1089.)

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.