Filed 2/28/13  P. v. Smith CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

|  |  |
|---|---|
| THE PEOPLE, | C067555 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F01139) |
| v. | |
| FRANK JAMES SMITH, | |
| Defendant and Appellant. | |

A jury found defendant Frank James Smith not guilty of attempted murder (Pen. Code,[1] §§ 664, 187) but guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664, 192, subd. (a)).  The jury also found true allegations defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the attempted voluntary manslaughter. The trial court sentenced defendant to an aggregate term of 10 years in state prison,

---

[1] Further undesignated section references are to the Penal Code.

1

consisting of 3 years (the middle term) for the attempted voluntary manslaughter, plus 4 years for the firearm enhancement, and 3 years for the great bodily injury enhancement.

Defendant appeals, contending the trial court abused its discretion and violated his constitutional right to present a defense when it excluded evidence of prior threats and acts of vandalism by members of the victim's family. He also claims the trial court ran afoul of section 654 in imposing sentences on both the firearm and great bodily injury enhancements, and erred in relying on defendant's firearm use and planning in deciding to impose the middle term on the substantive offense.

We shall conclude that any error in excluding evidence of prior threats or acts of vandalism by members of the victim's family did not rise to the level of an unconstitutional deprivation of the right to present a defense, is reviewable under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), and is harmless. We shall further conclude that the trial court did not err in sentencing defendant. Accordingly, we shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I

The Prosecution

On February 10, 2010, Joseph Williams sprained his back at work lifting a heavy object and telephoned his mother to pick him up. Joseph's[2] mother stopped by her home on Conifer Way in North Sacramento on the way to drop off Joseph at his residence. Joseph did not live with his parents; he lived with his wife and two children. Joseph's teenage brothers Benjamin Williams and David Williams lived with Joseph's parents.

While preparing to leave his parents' home, Joseph heard his brother Benjamin arguing with defendant who lived next door. Joseph walked over to where the argument

---

[2] We shall refer to various individuals by their first names to avoid confusion; no disrespect is intended.

2

was taking place and told Benjamin to leave because he was making matters worse. Defendant went inside his home and Benjamin left.

Moments later, defendant and his brother Wayne came outside. Defendant had a .40-caliber handgun. Wayne shouted that Joseph had a knife and told defendant to shoot Joseph. Joseph raised his hands and told defendant he did not have a weapon, only an iPod. Joseph was holding an iPod in his right hand; he did not have a knife. Defendant shot Joseph in the abdomen while Joseph's hands were raised above his head.

Prior to that day, Joseph had never seen defendant or his brother Wayne. Members of Joseph's family had argued with defendant and members of his family in the past.

II
The Defense

Defendant and his brother Wayne both testified on defendant's behalf. Wayne, who was 48 years old at the time of trial, testified that on the day of the shooting he was laying in bed when he heard yelling. He got up to see what was going on and saw Joseph running toward him stating, "I'll take on both you mother fuckers" while making stabbing motions with a knife with a six-inch blade. As Joseph approached defendant, defendant hit Joseph in the face, causing Joseph to take a couple of steps backwards. Joseph again came at defendant and attempted to stab defendant in the neck, and defendant shot Joseph in the abdomen. Wayne did not know where the knife went after the shooting. "It was in [Joseph's] hand and then it disappeared." He did not see anyone take anything from Joseph after the shooting.

Defendant, who was 40 years old at the time of trial, testified that he shot Joseph because Joseph attempted to stab him. He had just awakened and gone outside to smoke a cigarette when Benjamin rode by on a bicycle, and the two exchanged words. Thereafter, Joseph approached him and screamed for defendant to "quit fucking with my little brother." Joseph then pulled out a knife and threatened to kill everyone in

3

defendant's house and to burn the house down. Defendant went inside his home, grabbed his gun off a DVD cabinet, and placed it in his pocket. His intention was to scare Joseph with it. While defendant reached for his gun, Joseph disappeared from view. At that point, Wayne came outside, and he and defendant walked into the street. As defendant stood there with his brother Wayne, he saw Joseph walking back toward his parents' house. Joseph then turned around, jogged back toward defendant and Wayne, and said, "I'll take on both of you motherfuckers." Joseph was agitated, pulled out his knife, and began "swing[ing] it around." At that point, Benjamin came around the corner, and Joseph said, "[N]ow it's two and two." Defendant placed his hand on the gun, which was in his pocket. As defendant turned to see where Benjamin was, Wayne told him to watch out. Defendant saw Joseph's knife coming toward his head. Defendant stumbled backwards, pulled out his gun, and shot Joseph. He then went inside his house and telephoned 911. Defendant had never seen Joseph prior to that day.

### III
### Stipulated Facts

The following stipulations were read to the jury before evidence was presented and again after both sides rested their cases. The first stipulation read:

"The residents of 2208 Conifer Way, the Smith family and the residen[ts] of 2212 Conifer Way, the Williams and Deathrage[3] families, had a history of arguments with each other in the months preceding the events of February 10th, 2010.

"On the evening of February 9th, 2010, an argument occurred between members of the Smith household and members of the Williams household. The argument occurred due to a belief by Frank Smith or Wayne Smith that either David Williams, Benjamin Williams or one of the teenage associates of the Williams boys were responsible for some paint damage to the Smith residence.

---

[3] Joseph's mother's name is Katrina Deathrage.

4

"The police were called to the scene by both Frank Smith and David Williams in separate 911 phone calls. Both David Williams and Frank Smith stated that a person or persons from the other household had pulled one or more knives and made threats to shoot and harm members of the other group.

"In their 911 calls neither Frank Smith nor David Williams reported actually seeing a firearm. The police responded to the scene but were unable to locate any knives. No physical violence occurred during the argument on February 9th, 2010."

The second stipulation read:

"On February 10th, 2010, Joseph Williams was taken to Mercy San Juan Hospital where he was treated for injuries from a gunshot wound. Mr. Williams suffered a gunshot wound to his abdomen. The bullet struck Mr. Williams in the liver causing a major laceration. A large portion of Mr. Williams' liver was removed due to the laceration. The bullet shattered in Mr. Williams' body and fragments of the bullets [*sic*] remain inside of his body.

"Mr. Williams was discharged from the hospital on February 23rd, 2010. The injuries suffered by Joseph Williams constitutes [*sic*] great bodily injury within the meaning of Penal Code section 12022.7[, subdivision] (a)."

## DISCUSSION

### I

### Any Error in Excluding Evidence of Prior Threats or Acts of Vandalism by Joseph's Teenage Brothers or Their Friends Was Harmless

Defendant contends the trial court abused its discretion and violated his right to present a defense under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution when it excluded evidence of prior threats or acts of vandalism by Joseph's teenage brothers and their friends. As we shall explain, any error is one of state law, is reviewable under *Watson, supra,* 46 Cal.2d at page 836, and is harmless.

5

At trial, defendant sought to introduce the following evidence for the limited purpose of showing his state of mind at the time of the shooting. (Evid. Code, § 1101, subd. (b).)

1. On February 9, 2010, the evening before the shooting, Joseph's 17-year-old brother Benjamin and approximately six other teenagers verbally harassed defendant while he was at his mailbox. Benjamin and one other teenager had knives, and at least one teenager had a hand in his pocket and threatened to shoot defendant.

2. On the morning of February 1, 2010, defendant observed Joseph's 14-year-old brother David, Benjamin, and three or four other teenagers outside his home with what appeared to be a paint ball gun. Defendant later discovered that the exterior of his home was stained by paint balls, and he notified police.

3. On October 17 and 18, 2009, David and approximately ten other teenagers harassed defendant while riding bikes in front of defendant's home, stating "see how many people we have out here" and "[w]e are going to drag you out of your house and kick your ass." Defendant contacted the police on both dates.

4. On more than one occasion in 2009, David and other teenagers verbally harassed and threatened defendant and members of his family from a nearby tree house, calling them "fags" and stating, "We're going to kick your ass."

5. In early 2010, David, Benjamin, and their father were walking their Rottweiler on a leash in front of defendant's home. David and Benjamin laughed when the dog became "aggressive" and began barking at defendant. Defendant construed this incident as a threat.

6. Defendant's mailbox was repeatedly vandalized between 2007 and just prior to the shooting. The most recent vandalism occurred two weeks prior to the shooting. Each time the mailbox was vandalized it vibrated back and forth on a steel rod for about 30 seconds. On one occasion, defendant rushed outside and saw David running into his house next door.

6

7. From 2004 until the time of the shooting, defendant was the victim of numerous acts of vandalism. Those acts included punctured tires, a bent car antenna, and a burning bag of eggs left on defendant's door step. Defendant assumed David and Benjamin were responsible for those acts.

Following a hearing, the trial court tentatively ruled that the evidence concerning the incidents described in numbers 3 through 7 above would be excluded "under [Evidence Code, section] 352 if not under *Minifie*[**4**] because I don't think they rise to the level of the *Minifie* rule, and even if they did . . . it's a real [Evidence Code, section] 352 issue . . . ." After the court announced its tentative ruling, the prosecutor and defendant's trial counsel agreed to attempt to draft a stipulation that would cover the incidents detailed in numbers 1 and 2 above. The parties reached an agreement on a stipulation that was read to the jury both before evidence was presented and after each side rested its case. The stipulation is set forth above in the Factual and Procedural Background. (At pp. 4-5, *ante*.) The parties further agreed "that defense and prosecution witnesses may testify about how [those] stipulated facts affected them in the moments before the shooting on February 10, 2010, and how those events caused them to take certain actions." The court then confirmed its earlier tentative rulings.

Later, during trial, defendant sought to introduce evidence concerning his prior 911 calls, arguing the prosecutor had opened the door to the admission of such evidence by questioning him as to why he did not go inside and call 911 when he saw Joseph with a knife instead of grabbing a loaded firearm. In particular, defendant's trial counsel sought to question defendant about calls defendant made to 911 on October 17 and 18,

---

**4** *People v. Minifie* (1996) 13 Cal.4th 1055. In that case, our Supreme Court held "that evidence of third party threats is admissible to support a claim of self-defense if there is also evidence from which the jury may find that the defendant reasonably associated the victim with those threats." (*Id.* at p. 1060.)

7

2009, during which he expressed displeasure about the slow response time and how those prior experiences "relate[d] to his decision not to call 911" on the day of the shooting. The court refused to allow in evidence of the earlier 911 calls, ruling "that what problems may have happened four months earlier in [an]other series of 911 calls are too attenuated to bring into this case."

As a preliminary matter, we reject defendant's assertion the trial court's alleged error, if error, rose to the level of an unconstitutional deprivation of the right to present a defense. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) Although completely excluding evidence of an accused's defense theoretically could rise to this level, merely rejecting some evidence concerning a defense does not. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Here, as detailed above, the trial court did not exclude all evidence concerning defendant's claim that he acted in self-defense. Nor did the trial court exclude all evidence of prior threats or acts of vandalism by members of Joseph's family or their friends. Rather, the stipulation agreed to by the parties and read to the jury referred to "a history of arguments" between the two families, an incident involving Joseph's teenage brothers the night before the shooting, allegations the brothers were responsible for "paint damage" to defendant's home, and reports that the brothers had knives and threatened to shoot or harm members of defendant's family. Thus, "[i]f the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . ." (*People v. Fudge*, *supra*, 7 Cal.4th at pp. 1103.) Under the *Watson* standard, the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant. (*People v. Fudge*, *supra*, at p. 1104.)

8

In order to determine whether there is a reasonable probability the exclusion of the subject evidence affected the verdict adversely to defendant here, it is helpful to review the law of self-defense. To justify an act of self-defense, a defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) "Reasonableness is judged by how the situation appeared to the *defendant*, not the victim." (*Id.* at p. 1068.) " 'A person claiming self-defense is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." [Citation.] The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual. A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence "tend[ing] in reason to prove" that the fear was reasonable. [Citation.] Threats from the group on the defendant's life would certainly tend in reason to make the defendant fearful. This is especially true where the group has a reputation for violence, and that reputation is known to the defendant. Such threats are relevant to the defendant's state of mind--a matter "of consequence to the determination of the action" [citation]--and the trier of fact is entitled to consider those threats along with other relevant circumstances in deciding whether the defendant's actions were justified.' " (*Minifie*, *supra*, 13 Cal.4th at pp. 1065-1066.)

Defendant claims that the excluded evidence was "critical to the jury's proper understanding of [his] state of mind and to evaluate the reasonableness of his conduct on the date of the incident," and that its "exclusion adversely affected the verdict because [he] was effectively foreclosed from 'corroborat[ing] his testimony that he was in fear for his life by proving the reasonableness of such fear.' (*People v. Minifie, supra,* 13 Cal.4th at p. 1065.)" We disagree.

9

As previously mentioned, the jury found defendant not guilty of attempted murder but guilty of the lesser included offense of attempted voluntary manslaughter. To do so, the jury had to conclude that defendant intended to kill Joseph when he shot him, but that the prosecution failed to prove that defendant was not acting (1) as a result of a sudden quarrel or in the heat of passion *or* (2) under an unreasonable but good faith belief in having to act in self-defense. (See *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825; *People v. Barton* (1995) 12 Cal.4th 186, 201; see also CALCRIM Nos. 600, 603, 604.) The jury also necessarily rejected defendant's claim that he reasonably believed that he or someone else was in imminent danger of suffering bodily injury, reasonably believed the immediate use of force was necessary to defend against that danger, and used no more force than was reasonably necessary to defend against that danger. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; see also CALCRIM No. 3470.)

The excluded evidence would have added little to defendant's theory that he was acting in reasonable self-defense when he shot Joseph. The stipulation agreed to by the parties and read to the jury not only informed the jury that the Smith and Williams families "had a history of arguments with each other in the months preceding" the shooting, it detailed an incident that occurred the night before the shooting, which included reports that Joseph's brothers pulled one or more knives and made threats to shoot and harm defendant and members of his family. We fail to see how evidence that Joseph's teenage brothers and their friends previously threatened to "kick [defendant's] ass," vandalized defendant's mailbox, laughed when their dog acted aggressively towards defendant, or left a flaming bag of eggs on defendant's door step would have materially strengthened the defense theory that defendant's shooting of Joseph was justified. The strongest evidence supporting the defense -- the altercation that occurred between members of the two families the night before the shooting -- was admitted. Although arguably relevant, the excluded evidence would not have sufficed to overcome the jury's

10

conclusion that defendant did not reasonably believe that he or someone else was in imminent danger of suffering bodily injury, did not reasonably believe the immediate use of force was necessary to defend against that danger, and/or used more force than was reasonably necessary to defend against that danger. In other words, admission of the excluded evidence would not have resulted in a more favorable verdict for defendant, and thus, any error in excluding it was harmless. (See *Watson, supra,* 46 Cal.2d at p. 836.)

II

The Trial Court Correctly Imposed a Sentence on Both the Firearm and Great Bodily Injury Enhancements

Defendant next contends "[t]he trial court violated section 654 when it imposed punishment for both the great bodily injury enhancement and the personal firearm use enhancement" because both apply to the same act. He is mistaken.

While this case was pending on appeal, our Supreme Court issued its decision in *People v. Ahmed* (2011) 53 Cal.4th 156, 160, holding that "section 1170.1, permits the court to impose both one weapon enhancement and one great-bodily-injury enhancement," and thus, "we do not turn to section 654." (*Ibid.*) More particularly, the court relied on section 1170.1, subdivisions (f) and (g). (*People v. Ahmed, supra,* at pp. 165-166.) Subdivision (f) provides: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury." Subdivision (g) similarly provides: "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for being armed with

11

or using a dangerous or deadly weapon or a firearm." After reviewing the history of amendments to these two subdivisions, the court found it clear that "the Legislature that enacted those subdivisions intended to permit the sentencing court to impose both one weapon enhancement and one great-bodily-injury enhancement for *all* crimes." (*People v. Ahmed, supra,* 53 Cal.4th at p. 168.)

Accordingly, the trial court did not err in imposing a sentence on both the firearm and great bodily injury enhancements.

### III
### The Trial Court's Reliance on Defendant's Firearm Use as an Aggravating Factor Did Not Run Afoul of the Prohibition Against Dual Use Because Defendant Was Sentenced to the Middle Term, and There Was Sufficient Evidence to Support the Trial Court's Finding of Limited Planning

Lastly, defendant contends "the trial court erroneously relied on impermissible dual use of factors and made an erroneous finding on [the sole remaining] aggravating factor" at sentencing. Because "[t]here was no legally permissible aggravating factor to weigh against the mitigating factors found by the trial court," defendant asserts "there is a reasonable probability [defendant] would have received a more favorable sentence absent the court's errors." We disagree.

Defendant first claims the trial court impermissibly relied on the fact of his firearm use to impose a prison term on the firearm enhancement and as an aggravating factor in selecting the appropriate prison term. Defendant's argument is founded upon an incorrect premise. The prohibition against dual use applies to imposition of an "upper term" (§ 1170, subd. (b); see also Cal. Rules of Court, rule 4.420(c)), not, as occurred here, when the middle term is imposed. (See *People v. Haynes* (1984) 160 Cal.App.3d 1122, 1137-1138.) Indeed, in each of the cases relied on by defendant to support his claim that the trial court violated the prohibition against dual use, the defendant was sentenced to the *upper term*. (See *People v. Steele* (2000) 83 Cal.App.4th 212, 215;

12

*People v. Scott* (1994) 9 Cal.4th 331, 339-340; *People v. Kelley* (1997) 52 Cal.App.4th 568, 581.)

Given the lack of any rule prohibiting the trial court from relying on the fact of an enhancement to impose the middle term, we question whether the trial court's reliance on planning, even if in error, is of any consequence. Assuming without deciding that it is, we find there is sufficient evidence to support the trial court's finding that defendant engaged in limited planning. Based on the evidence presented, a reasonable trier of fact could conclude, as the trial court did here, that defendant's decision to "pick up the gun and carry it outside . . . to confront the person in the street" constituted a plan, albeit a "short-sided [*sic*]" one.

The trial court did not err in imposing the middle term on the substantive offense.

## DISPOSITION

The judgment is affirmed.


    BLEASE    , Acting P. J.


We concur:


    HULL    , J.


    HOCH    , J.

13