Filed 6/12/13  P. v. Vlahos-Schmidt CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GINGER VLAHOS-SCHMIDT,<br><br>        Defendant and Appellant. | A133704<br><br>(Alameda County<br>Super. Ct. No. 166552) |

INTRODUCTION

Defendant, a petite-120-pound woman, stabbed her 220-pound-male roommate in the back during an altercation in which he pummeled her in the face, bloodying her nose and blackening her eyes.  Defendant testified she stabbed her roommate in self-defense, and the trial court allowed her to recount a number of prior violent incidents between them, but prevented defendant from testifying that on one occasion her roommate threw her down the stairs and on another occasion threatened to kill her.  The jury was instructed on antecedent threats, but convicted defendant of felony assault.  On appeal, defendant argues the trial court's ruling violated her right to testify and constituted an abuse of discretion.  We agree the court erred, but after a review of the entire record, conclude the error was harmless beyond a reasonable doubt.  We will affirm.

STATEMENT OF THE CASE

An information alleged that on June 28, 2011 defendant Ginger Vlahos-Schmidt assaulted Zenon Lopata with a deadly weapon (a knife) and inflicted great bodily injury

1

on him.  (Pen. Code, §§ 245, subd. (a)(1), 12022.7, subd. (a).)[1]  A jury found defendant guilty as charged.  Defendant was sentenced to state prison for five years:  the low term of two years for the assault, and a consecutive three years for the great bodily injury enhancement.

STATEMENT OF FACTS

*The Prosecution's Case*

Lopata, defendant, and Alicia Brown shared a three-bedroom flat on the top floor of an old Victorian on the corner of East 15th Street and 24th Avenue in Oakland.  Each roommate had his or her own bedroom and shared a common kitchen, living room, and hallway.

On February 20, 2011, Brown invited a group of musician friends to spend the night in the common area of the apartment.  Lopata was unhappy about that and phoned the landlord from his room to complain.  Defendant overheard the conversation and when he opened the door to his room, she stabbed him in the bicep with a pocket knife.  He admitted pushing defendant, but denied slapping her in the face.  The guests came to her defense, "beat[ing him] up and jump[ing] in [his] face."  Lopata called 911 three times and said his life had been threatened, but "nobody came."  Police dispatch evidence corroborated Lopata's calls.

There was also a dispute that day over vodka.  Defendant had been drinking Lopata's vodka the day before and had promised to replace it the next day.  Lopata asked defendant if she had replaced the vodka, and since she had not, Brown went out to get more.

For many weeks after that incident, there was no conversation or socializing between the three roommates, but by June 28, defendant and Lopata had begun talking again.  Defendant had downloaded the television series "Weeds" on her laptop, and she offered to watch it with him.  They plugged the computer into the television in his

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

bedroom and watched the show for an hour and a half or two hours. He was in his chair eating and having "a few shots" while defendant sat on his bed drinking beer and vodka.

For some reason Lopata could not remember, a dispute arose and defendant punched him in the face. Defendant is a small woman, and he is 5 feet, 10 inches tall and weighs 220 pounds. She did not hit him very hard, but it was hard enough that he wanted the evening to be over. He pushed her out of his room and placed the laptop on the counter in the kitchen. She was not injured and went to her room.

About 10 or 15 minutes later, while he was hanging clothes in his room, he heard running steps and felt a big jolt in his back on the left side. He forcefully pushed her away from him and she fell to the ground against the heater and Alicia Brown's door. It is possible she could have been injured, but he did not see it because he was bleeding profusely and was in great pain as he knocked on Brown's door. He denied punching defendant in the face.

Defendant got up and ran away, yelling at Lopata that she was going to "call her friends at Hells Angels to have them kill me." At that point, he saw the knife in her hand. Lopata could not find his cell phone and Brown refused to open her door, so Lopata called 911 from the manager's apartment downstairs. Evidence of the 911 call was presented. This time, the police came right away and he was transported to Highland Hospital by ambulance. Defendant was detained and disarmed of the knife outside the gate to the apartment building. Her nose was injured, and she was distraught. Photos taken of both defendant and Lopata at the scene were admitted into evidence.

Lopata acknowledged that defendant had accused him of throwing her down the stairs, tossing her out of a futon, and spanking her, but Lopata maintained, "that never happened." He denied telling defendant "your time is coming to an end, darling. You're going to get what's coming to you." He denied calling somebody on February 20 and saying, "you've got to come over here; we've got to kill these bitches." He did admit throwing a slipper that defendant had left in his room down the hallway in her direction.

3

*The Defense Case*

Defendant testified in her own behalf. Significantly, she testified to prior assaults and threats committed by Lopata. According to defendant, when she moved into the apartment in October 2010, Brown and Lopata already lived there. At first, they all got along well; she and Lopata cooked and ate together. Things began to change after a month. Lopata would get pushy and mad if defendant declined to drink with him. Lopata pretty much drank all day. He made mean, derogatory comments to defendant, argued with everything she said and put her down.

Once, in November or December 2010, for no apparent reason, Lopata overturned a futon while defendant was reclining on it. Lopata then went into his room and stayed there for the rest of the night. The next day Lopata apologized and acknowledged that his actions were "uncalled for."

Another time, shortly before February 20, 2011, Lopata threw defendant onto the futon and spanked her when she refused to drink with him. Defendant talked to Brown, a few of her friends, and the landlord about this incident.

On February 20, 2011, defendant asked Brown to go to the store to get more vodka, because Lopata's vodka was running low and defendant was afraid he would get angry when he ran out of it. When Lopata ran out of vodka before Brown returned, he yelled at defendant, grabbed her arms, and brought her towards him really hard. Because she was afraid of defendant who was out of control, she had a pocket knife in her hands. When Lopata would not let go of her, she brought the knife down onto his arm. "[T]hen he let go" and pushed her away. Some musician friends of Brown were staying at the apartment at the time of this incident.

Defendant heard Lopata say several times that he was calling the police. She also overheard Lopata say to someone on the phone: "You need to get over here now. We need to kill a couple of these bitches over here. We have two bitches. We need to take care of them." She told Brown to call the police and then waited outside with her son for the police to arrive for about 40 minutes. When no one came, defendant left with her son.

4

She did not make a police report. After this incident, she asked the landlords to let her out of her contract, but they refused to do so.

Defendant was not on speaking terms with Lopata for many months after the February 20 incident. At some point, Lopata started making small talk with her when her son was visiting, and she was courteous to Lopata to keep the peace in front of her son.

Lopata kept asking defendant if she would let him watch the last season of the television series "Weeds" before the new season began, and on June 28 she agreed. She set up the computer and sat down to watch it with him for a few minutes before leaving to do something else, but he closed the door to his room after she sat down. She felt very uncomfortable with the door closed, but she "just played it off," talking to him for a few minutes before making an excuse to exit. She left and entered the room several times to "see where he was in the series, being courteous."

Right before the incident, defendant left to smoke a cigarette outside on the balcony. It was raining, and she put on her jacket. In the jacket pocket was a knife she had put there earlier in the day when she went to a store in a dangerous part of the neighborhood to buy cigarettes. After smoking her cigarette for about five minutes, she went back inside to check on Lopata again. "As soon as I turned the corner to his room, he started punching me in the face[.]" Defendant was pinned against the door and could not move while he was hitting her. Defendant was scared, shocked, and in pain. She "didn't know if he was going to stop." She pulled the knife out of her jacket pocket, "swung with it" just once with her right hand and connected. She was not aiming at any part of his body and could not see what she was doing because she "was being pummeled in the face." When the knife connected with Lopata he stopped hitting defendant. Defendant testified on cross-examination that she stabbed Lopata in self-defense. She did not, however, call the police that night.

Defendant ran as fast as she could out the door, slipped on a towel Lopata kept outside his door, and hit the heater with her left shoulder and arm. She caught herself before she fell down and continued running out the front door with the knife and sheath in her hand. She got into her car and drove to a friend's house for help. The friend did

5

not respond to her honking and yelling outside his house. She drove back to her apartment and parked the car in the secure parking area.

She was detained by police when she walked into the front yard of the apartment building. Defendant testified she had a broken nose, a lump on her forehead, a chipped and loose tooth, and a swollen face. Her eyes turned black the next day. She was taken by ambulance to the hospital. Defendant gave her statement to the police about what Lopata had done to her. However, at the hospital, "the woman" who arrested defendant said she did not write down defendant's statement; she just wrote that defendant wanted to wait until she spoke to an attorney.

Alicia Brown testified that on the night of June 28, she arrived home from work around 6:00 p.m. and heard defendant in Lopata's room. It sounded friendly. She went into her room and turned on her music. She did not see or hear the altercation.

Nor did Brown see the altercation between defendant and Lopata on February 20. However, she generally corroborated defendant's version of the events leading up to that altercation and its aftermath. In particular, she testified that while she and defendant were waiting for the police to arrive, Lopata told somebody on the phone, "You need to get over here. We need to kill these bitches." Brown called 911 and left the apartment. The police responded two hours later. Brown also testified that while she never saw Lopata hit or hurt defendant, she was afraid of Lopata.

Defendant's former boyfriend testified as a character witness. In the eight or nine years he had known defendant, he had never known her to be physically assaultive or violent, even when she had too much to drink.

One of the visiting musicians testified about the confrontation between defendant and Lopata on February 20. Lopata became loud, rude and angry. Defendant was trying to calm him down and Lopata was yelling at her. Lopata pushed defendant forcefully into the wall. The visitor confronted Lopata about his behavior, but Lopata responded that he could do whatever he wanted to defendant because it was his house. The visitor did not see defendant stab Lopata in the arm.

6

DISCUSSION

Defendant argues the trial court abused its discretion and violated her right to testify under *Rock v. Arkansas* (1987) 483 U.S. 44 when it ruled she could not testify that in November 2010 Lopata pushed her down the stairs and in March 2011 he threatened her, saying: "Your time is coming to an end, darling. You are going to get what you deserve." The trial court gave two reasons for excluding the evidence. First, the trial court indicated that provisions of state law on reciprocal discovery in criminal cases required defendant to: a) disclose to the prosecutor prior to trial that she intended to testify about the victim's prior assaultive and threatening behavior towards her, and (b) litigate the admissibility of such testimony prior to trial. Evidently, the evidence was excluded as a sanction for the perceived discovery violation.

Second, the trial court stated that allowing evidence of multiple prior incidents would occasion an undue consumption of time. Therefore, the court ruled defendant could testify about a slipper incident, a spanking incident, and a slapping incident, but not about the stair-throwing or threat incidents. A defense request for reconsideration of this ruling was denied for the additional reason that a threat in March was not relevant to the June 28 offense, given that defendant "went into [Lopata's ] room that day to . . . show him the video [and] [i]t didn't look like she was still scared of him."

The Attorney General does not attempt to defend the discovery sanction aspect of the court's ruling. Our own review of section 1054.3, which governs the defense's disclosure obligation to the prosecution, does not reveal any legal basis for the court's ruling. On the contrary, case law interprets section 1054.3 as "requir[ing] defense counsel to disclose to the prosecution *all* relevant statements made by persons, *other than the defendant,* whom the defense intends to call as witnesses at trial, including unrecorded oral statements relayed to defense counsel in an oral report by a third party, such as an investigator, and oral statements made by the person directly to defense counsel." (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 160, second italics added.)

7

Nor does the court's implicit Evidence Code section 352 ruling withstand analysis. It is well settled that evidence of antecedent threats and assaults by the victim against the defendant is admissible on the question whether the defendant acted reasonably in self-defense. (*People v. Moore* (1954) 43 Cal.2d 517, 527–529; *People v. Minifie* (1996) 13 Cal.4th 1055, 1069.) The jury in this case was instructed on that principle and on its corollary: "Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person." (CALCRIM No. 3470.) Evidence of Lopata's prior threats and acts of violence towards defendant were admissible and relevant to defendant's claim she acted in self-defense. "Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation & fn. omitted.] But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." (*Rock v. Arkansas, supra*, 483 U.S. at pp. 55–56.) In our view, the court's response to defendant's proposed testimony that Lopata pushed her down the stairs and later threatened her life was disproportionate to the purposes served by Evidence Code section 352. In particular, the court abused its discretion when it prevented defendant from testifying that Lopata threatened her life, particularly after it permitted Lopata to *deny* he ever said, "[y]our time is coming to an end, darling. You are going to get what you deserve."

Defendant maintains the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) and requires reversal, but after careful review of the entire record, we do not agree. In fact, the court did allow the jury to consider a great deal of evidence of Lopata's prior violent behavior toward defendant which, if believed, could have supported an acquittal based on self-defense. Moreover, the court correctly instructed the jury on self-defense and antecedent threats, and evidence of one such threat was admitted. In addition, defendant testified at length about the injuries she suffered at

Lopata's hands on June 28 and about the circumstances under which she stabbed Lopata in the back. Photos of both parties' injuries were admitted, as well as evidence of Lopata's 911 calls to police, and defendant's failure to call the police. "Under *Chapman*, the question is whether there is a reasonable doubt that the error contributed to the verdict." (*People v. James* (2000) 81 Cal.App.4th 1343, 1362.) Here, we are convinced beyond a reasonable doubt the error did not contribute to the verdict because the excluded evidence was "unimportant in relation to *everything else* the jury considered on the question of the defendant's guilt, as revealed in the record." (*Ibid.*, citing *Yates v. Evatt* (1991) 500 U.S. 391, 403, italics added, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73, fn. 4.)

DISPOSITION

The judgment is affirmed.


_____

Margulies, Acting P.J.


We concur:


_____

Dondero, J.

_____

Banke, J.


9