Filed 7/8/14  P. v. Cairns CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C071042 |
| Plaintiff and Respondent, | (Super. Ct. No. P11CRF0100) |
| v. | |
| KEVIN MICHAEL CAIRNS, | |
| Defendant and Appellant. | |

An information charged defendant Kevin Michael Cairns with six counts related to three separate incidents in which he confronted travelers on Highway 50 who stopped in the parking lot of his restaurant to vomit after experiencing travel sickness.  In each instance, defendant ordered the sick traveler to leave immediately.  Their refusals led to altercations and to defendant being charged with six counts of criminal conduct. Counts I, II, and III are offenses resulting from an incident that occurred on November 28, 2010, involving Joseph Goodrich:  assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)—count I),[1] vandalism

---

[1] Undesignated section references are to the Penal Code.

1

exceeding $400 (§ 594, subd. (b)(1)—count II), and exhibiting a deadly weapon (brandishing), a misdemeanor (§ 417, subd. (a)(1)—count III).

As a consequence of an incident that occurred on February 11, 2011, involving Jessica Enes, defendant was charged with assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(1)—count IV.) It was further alleged that defendant committed the offense while out on bail. (§ 12022.1.)

With respect to an incident that occurred on March 11, 2011, involving Thy and Marques Bartice, defendant was charged with disturbing the peace by using offensive language, a misdemeanor. (§ 415, subd. (3)—count V.)[2]

The jury acquitted defendant of the felony assault offenses, counts I and IV, but convicted him on the lesser included offense of misdemeanor assault (§ 240) on both counts. The jury acquitted defendant of felony vandalism, count II, but convicted him on the lesser included offense of vandalism under $400, a misdemeanor. (§ 594, subd. (a)(1).) The jury convicted defendant of count III, brandishing, a misdemeanor, and count V, disturbing the peace by using offensive language, a misdemeanor. The jury found the on-bail enhancement to be true.

Granted probation, defendant appeals. He contends the trial court prejudicially erred in failing to instruct on self-defense as requested with respect to counts I, II, III, and IV and in excluding evidence of prior assaults upon defendant. Defendant also contends that insufficient evidence supports his misdemeanor conviction for disturbing the peace by using offensive language (count V). We will reverse defendant's convictions for the misdemeanor assaults, vandalism, and brandishing and strike the on-bail enhancement, but will affirm his conviction for misdemeanor disturbing the peace.

---

[2] Defendant was also charged with disturbing the peace by a loud noise, a misdemeanor. (§ 415, subd. (2)—count VI.) The prosecutor dismissed count VI during trial.

## FACTUAL BACKGROUND

For reasons not revealed by the record, the parking lot of defendant's restaurant, situated along Highway 50, became a rest stop for travelers made ill no doubt by the highway's twists, turns, and altitude. Defendant objected vehemently to the deposit of vomit in the parking lot, believing that it reduced the appeal of his restaurant to his customers, and on the three occasions charged became involved in altercations with the unwelcome travelers. We summarize the facts concerning each incident, facts which combine elements of tragedy and comedy, though the ultimate outcome for defendant is pure tragedy. Because the principal issue raised by defendant concerns the sufficiency of the evidence to warrant instruction on self-defense, we emphasize those facts that have a bearing on that theme.

### The Goodrich Incident—November 28, 2010

Joseph Goodrich and his passengers, who included seven-year-old Owen, were traveling westbound on Highway 50 after a day of snowboarding at a ski resort. When Owen became carsick and started vomiting out the truck window, Goodrich crossed over oncoming traffic and pulled up in front of defendant's restaurant, Dante's on the River (Dante's).[3] Accounts as to what transpired vary, though not in critical detail.

According to Goodrich, within 30 seconds of his pulling up to the restaurant, defendant stepped outside onto the deck and told Goodrich to "[g]et the fuck out of here." Goodrich refused to leave, telling defendant they would leave when Owen was finished vomiting. Goodrich denied seeing any posted signs. Defendant threw several snowballs at Goodrich's truck. About a minute and a half after pulling up, Goodrich got out to look at his truck. Goodrich wanted "to kill" defendant. Tom, another passenger, also got out of Goodrich's truck. Tom stood about six feet three inches tall and weighed about

---

[3] The restaurant's video surveillance with no audio was played for Goodrich, who described what he saw.

3

250 pounds. Defendant got his large dog and threatened to have the dog bite Goodrich if he refused to leave. Goodrich thought about hitting defendant but did not because of the dog. Goodrich was irate, exchanged profanities with defendant, and refused to leave defendant's property, explaining that he (Goodrich) was "standing [his] ground." Goodrich had nothing to fear from defendant's canine. When defendant and the dog approached, Goodrich petted the friendly dog, which licked his hand. About two-and-a-half minutes after arriving, Tom threw something at defendant, hitting him, and then Tom and Goodrich got back into the truck.

It was at this point that defendant committed the act that the prosecution relied on as the basis for the assault (count I), vandalism (count II), and brandishing (count III) charges. According to Goodrich, defendant then came at him with a two-by-four board with nails sticking out of it. Defendant stuck the board through the truck window close to Goodrich's face, telling him to leave. Goodrich was "[v]ery mad" and wanted to "kill" defendant but remained in his truck and called the sheriff. Goodrich still refused to leave. Goodrich admitted that he and Tom yelled at defendant's customers not to eat at defendant's restaurant because it was "a lousy place." Defendant hit Goodrich's truck with the board he had waved in Goodrich's face. Defendant then went inside the restaurant. Goodrich told the sheriff's dispatcher that if defendant came back outside, he (Goodrich) would kill defendant. Having initially refused to leave when told to do so by dispatch, Goodrich left only after a supervisor with dispatch told him to go down the road, where he should wait for a deputy sheriff. Goodrich claimed that he found dents on the driver's-side door post, front fender, and back bumper, and scratches on the tailgate of his six month old, limited edition, $82,000 truck.

Defendant's version of the events varied a bit from Goodrich's. Defendant testified he saw Goodrich's truck in front of defendant's neighbor's house with a child throwing up out the truck's window. Defendant claimed that Goodrich had left the neighbor's house without cleaning up the vomit there. Immediately after Goodrich and

4

his passengers pulled up to Dante's, defendant went out and informed them that the parking lot was posted private property and was not the place to vomit. Goodrich rolled his window down and yelled, "Fuck off. The kid's got to puke." Goodrich also told defendant that he was going to get out and beat defendant up. Defendant responded by throwing a snowball at the truck's windshield. Goodrich said he was going to get out and kill defendant. Defendant threw a chunk of ice into the truck bed and had his wife, Nancy Cairns, get the dog because he felt threatened. Goodrich got out of the truck and threatened to kill defendant. Tom got out of the truck too and threw a snowball at the dog and then threw a chunk of ice that hit defendant and the dog.

Defendant then put the dog behind a fence for safety and, from a pile of construction waste, grabbed a stick with nails in it. According to defendant's testimony, he grabbed the stick to protect himself against Goodrich and Tom, who had just assaulted him and his dog with ice and refused to leave even when told to do so by dispatch. Defendant used the side of the stick without nails to hit the back of the truck one time, telling Goodrich to "[g]et the fuck out of here," but Goodrich refused to leave. Defendant claimed he was afraid of Goodrich and Tom the entire time. Defendant put the stick down and went inside the restaurant. Defendant admitted that in his prior statements he had not claimed Goodrich had threatened to kill him, only to "kick [his] ass" and knock his other front tooth out.

Defendant's version of the events was largely corroborated by the testimony of his employee, waitress Kelley Doyle, who recalled Tom got out of the truck and threw a chunk of ice, hitting defendant in the head, which caused a bump, and that defendant grabbed a stick and used it to hit the back of the truck. However, Doyle thought the stick defendant used to hit the truck was "maybe two-by-two." The testimony of defendant's wife, Nancy, was to the same effect: defendant was hit in the head by something that Tom threw, whereupon defendant grabbed a stick that was about 16 inches long and a

5

"half dollar wide" and hit Goodrich's truck.**4** Later that night, defendant vomited because he had a concussion.

**The Enes Incident—February 11, 2011**

About 9:00 p.m., Daniel and Jessica Enes were driving eastbound on Highway 50 toward South Lake Tahoe when Jessica informed Daniel that she was sick and needed to stop. They had just eaten some fast food. Daniel pulled into the first available spot, Dante's parking lot. Jessica got out of the truck and began vomiting on the ground. Within 30 to 60 seconds, both defendant and Nancy yelled and screamed, "Oh, my God," "What are you doing?" "You fucking pig," "Get the fuck out of here," and "This is private property." Defendant pounded his hands on the truck hood several times. Nancy stood by Jessica, yelling profanities and screaming at her to leave. Jessica claimed that when she sat down in the truck, defendant called her a "filthy fucking pig" and pushed the door against her leg, which was not yet in the truck. After she got her foot into the truck, she threw a bag containing vomit and leftover fast food out the truck's window. She denied trying to hit anyone. Defendant then threw a traffic cone through the open window, causing a gash, scrape, and large bump on Jessica's arm and a minor cut on her hand. Daniel put the truck in park, jumped out, and ran toward defendant, but Nancy got between them and defendant retreated behind a car. Daniel threatened defendant. Defendant and Nancy went into the restaurant and turned the lights out. Nancy came back outside and said she had the police on the phone and was reporting Daniel's license plate number. Daniel and Jessica made a call, talked to the sheriff's dispatcher, and waited for a deputy to arrive.

A deputy sheriff arrived and spoke with the Eneses and Cairnses. The deputy saw vomit on the ground but saw no vomit on either defendant or Nancy. Nancy said that the

---

**4** The dimensions of the stick varied from witness to witness. The stick was not recovered during the investigation.

bag did not hit her and she did not think any vomit had gotten on her. The bag did not hit defendant either. Defendant admitted throwing a traffic cone at the Eneses' truck because Jessica had thrown a bag containing something at Nancy's face. Before the deputy arrived, Daniel or Jessica had picked up the bag and put it in their truck bed. The deputy saw the bag but did not collect it as evidence.

Nancy testified about the Enes incident. Nancy asked Jessica what was going on and Jessica responded, "What the fuck does it look like? You stupid cunt. I'm throwing up." Defendant hit the hood of the Eneses' truck to get them to leave. Daniel backed up the truck and Jessica yelled, "You fucking cunt" and threw something out of the window. Nancy turned and put her arms up to avoid whatever had been thrown at her. When she looked back at the truck, a traffic cone was inside the truck. Nancy claimed that defendant threw the cone, "[d]efending" her and reacting to stop whatever else the Eneses might throw out their window.

Defendant testified that he was outside placing cones in the parking lot to close it off because the restaurant was closed. The Enes couple pulled up in a large truck and parked across three parking spots in the restaurant's parking lot. Nancy told them to leave because she did not want to clean up Jessica's vomit. Jessica was furious and called Nancy a "fucking bitch." Defendant banged on the hood of the truck and told Daniel that it was private property and to take it down the road. Defendant and Nancy told the Enes couple to leave several times. Jessica got into the truck but left her door open and continued calling Nancy a "fucking bitch." Defendant walked up to the truck and closed Jessica's door, disputing her testimony that her leg was still not in the truck. After Daniel drove the truck in reverse, Jessica rolled her window down, called Nancy a "fucking cunt," and threw a bag measuring about eight and one-half inches by 11 inches at Nancy. Within seconds, as the bag was in the air, defendant threw a traffic cone underhanded, "just like [he] was throwing horseshoes," into the truck from six to 10 feet away. Defendant claimed he was protecting Nancy against an attack by Jessica. The bag

7

landed at Nancy's feet and splashed vomit on defendant and Nancy. After the cone landed in the truck, Daniel chased defendant, who fled into the restaurant. Defendant claimed he was afraid when Daniel chased him.

Defendant presented a video surveillance tape from the restaurant's security system. The video showed that after Daniel backed up the truck, Jessica threw something out her window at Nancy. It did not show Jessica throwing the bag of vomit to stop defendant or Nancy from shutting the door on her leg.

Deputy Simon Brown noted the bag thrown by Jessica Enes had vomit on the outside and, he assumed, on the inside as well. Jessica told him that she threw the bag to get defendant to stop pushing the truck door on her leg. She did not have any marks on her leg.

**The Bartice Incident—March 11, 2011**

Late in the evening, Marques Bartice was driving his spouse Thy, their 18-month-old baby, and their three-and-a-half-year-old child to South Lake Tahoe when the baby became carsick and vomited. After pulling into Dante's parking lot and parking in a marked parking space, Marques went inside the restaurant and asked for a plastic bag and some paper towels to clean up his baby. A woman at the counter said he could not use the bathroom and told him to leave. He left. Meanwhile, Thy had taken the baby out of the car and put him on the ground. Defendant, who had his dog, yelled at Thy to leave. The dog seemed aggressive to Thy. Nancy came out with a camera and yelled at Thy to leave their property. Thy heard defendant call Marques a "pig." Marques could see that Thy was upset. Defendant and Nancy called Marques and his family a "bunch of pigs." According to Marques, defendant then called Marques a "black," not fat, "pig." Marques asked the Cairnses if they were religious and told them to calm down as his family got back into the car. Defendant again called Marques and his family a "bunch of pigs." Marques drove away while Nancy and defendant continued their yelling.

Nancy was called by the prosecutor to testify in his case-in-chief since she had recorded the confrontation in the parking lot; the recording was played for the jury. Nancy testified that Marques entered the restaurant and asked for paper towels. Nancy estimated that Marques was five feet eight inches tall and weighed about 200 pounds. She refused to help him because she did not want to clean up any mess he might leave in the parking lot. Indignant, Marques asked, "Are you serious?" and "You're not going to help me out?" then turned and left. Nancy grabbed her camcorder and followed. At the beginning, as she walked out, she heard defendant tell Marques, "Deal with it, brotha." Marques told Thy to "ignore" defendant and Nancy.

Defendant testified that he was walking his dog when he saw Thy wiping vomit off of her baby onto the ground. Defendant asked Thy to leave, explaining it was private property. Defendant saw Marques coming out of Dante's and told him it was private property and to leave. Marques responded that there was vomit in his car and he would leave when he was done cleaning his car. Defendant told him, "Deal with it, brotha." Defendant explained that he was from Detroit, "brotha" was commonly used regardless of race, and he had black friends. Defendant admitted calling Marques a "fucking fat pig" but denied calling Marques a "black pig." When told that Marques was pressing charges for disturbing the peace, defendant asked that Marques be arrested for trespassing. Defendant claimed the only peace he disturbed was the peace of a trespasser.

Nancy also testified that defendant called Marques Bartice a "[f]at ass pig." Dante waitress Kelley Doyle testified that she had never heard defendant use racial slurs.

9

**Evidence Code Section 1101, Subdivision (b) Evidence[5]**

Sometime in November 2010 Chris Gubera was traveling to South Lake Tahoe with his children and his 74-year-old mother. Gubera stopped in the Dante's parking lot, and when he unbuckled his two-year-old son, his son vomited inside the car and on Gubera's lap. Gubera started cleaning up the mess, using baby wipes and diapers, which he dropped on the ground between his feet. Defendant came out of the restaurant and told Gubera to pick up his trash and to leave. Gubera told defendant, "No, sir," and claimed that he would clean up and wanted to buy some food in the restaurant. Defendant responded that Gubera was not welcome and called him a "[fuck]ing pig." Gubera's children began to cry. Nancy came out of the restaurant and called Gubera a "[fuck]ing pig." Defendant jumped onto the running board of Gubera's vehicle; pounded on the vehicle; and yelled, "[g]et the [fuck] out of my parking lot, you [fuck]ing pig." Nancy was trying to get Gubera's license plate number to report to the police. Gubera walked up to defendant and threatened, "If you don't get out of my . . . fucking face, I'm going to kill you." Defendant, obviously afraid, backed up and left as Gubera walked toward him. Gubera then got into his car and left.

**Defense Character Evidence**

William Terry, a retired police chief, had gone to Dante's over the years and opined that defendant was not a violent person. Despite intense cross-examination, Terry maintained that defendant must have been provoked in the charged incidents. Susan McVey had been friends with defendant and Nancy for years and opined that defendant

---

[5] Over defendant's relevance and Evidence Code section 352 objections, the prosecutor was allowed to present Evidence Code section 1101, subdivision (b) evidence at the beginning of his case-in-chief, before any of the testimony from the alleged victims of the charged offenses. The prosecutor explained to the court that defense counsel had told jurors during voir dire that it was a self-defense case and that he (the prosecutor) had to prove defendant's intent.

was not a violent person and would not say anything racially offensive. Again, despite intense cross-examination, McVey maintained her belief that defendant "would have to be pretty darn provoked to go over the top." The prosecutor said the jury knew "who provoked who." Raymond Ricciardi had been defendant's neighbor for seven years. Ricciardi had put up a wall and gate to stop the activity of travelers from happening on his property. Ricciardi opined that defendant did not have a propensity for violence. When shown the video of the Bartice incident, Ricciardi agreed that defendant's conduct was inconsistent with his opinion but stated he did not know what had happened before since he had not been present. Joyce Alderete testified that she had dined at Dante's for many years and opined that defendant was not violent and did not use racially offensive words.

## DISCUSSION

### I

Despite its unsavory subject matter and accounts of remarkably boorish behavior by many of the adult actors, this is not a difficult case. Defendant contends the court erred in refusing to instruct the jury on self-defense, and its error requires reversal of the assault, vandalism, and brandishing offenses. After reviewing the evidence; comments of the trial judge, particularly the court's response to questions by the jury; and arguments of counsel on self-defense, and applying well-settled rules regarding the obligation of trial courts to instruct on self-defense, we conclude defendant is correct.

**Instructions**

Prior to trial, the *prosecutor* requested that the trial court give self-defense instructions. (CALCRIM Nos. 3470, 3472, 3475, 3476.)

After the presentation of evidence, defense counsel requested the instruction on defendant's right to self-defense or defense of another (CALCRIM No. 3470), arguing that Goodrich and Tom could have exited the truck to attack defendant again and that the facts supported the instruction with respect to the Enes incident in that defendant feared

11

for Nancy.  The prosecutor objected.  With respect to the Goodrich incident, the prosecutor argued that defendant assaulted Goodrich with the board after Goodrich and Tom had retreated from a "verbal" confrontation.  With respect to the Enes incident, the prosecutor argued that defendant's response of throwing the cone in reaction to a "small Taco Bell bag with unknown contents" was not reasonable.

In denying the instruction, the trial court agreed with the prosecution that the danger had ceased by the time defendant waved the stick at Goodrich, who had retreated to and was sitting in his truck.  With respect to the Enes incident, the trial court found that the danger "had already happened when [defendant] threw the cone."

The trial court instructed the jury on the elements of assault with a deadly weapon or by means of force likely to produce great bodily injury (CALCRIM No. 875) and the lesser included offense of simple assault (CALCRIM No. 915), *deleting* the element requiring the prosecutor to prove that "[[t]he defendant did not act (in self-defense/ [or] in defense of someone else).]."

The court instructed the jury in the language of CALCRIM No. 917 that "[w]ords, no matter how offensive, and *acts that are not threatening, are not enough to justify an assault or battery*."  (Italics added.)  The court instructed the jury on the elements of vandalism exceeding $400 and the lesser included offense of vandalism under $400 (CALCRIM No. 2900), both of which require the prosecutor to prove that defendant "maliciously" damaged or destroyed personal property ("Someone acts maliciously when he or she intentionally does a *wrongful act* or when he or she acts with the *unlawful intent* to annoy or injure someone else.").  (Italics added.)

The court instructed the jury on the elements of brandishing.  (CALCRIM No. 983.)  Although the court had decided not to instruct on self-defense, the brandishing instruction, as given to the jury, *included* bracketed element No. 3, which required the prosecutor to prove that "[[t]he defendant did not act (in self-defense/ [or] in defense of someone else).]"  The Bench Notes for CALCRIM No. 983 state that when there is

sufficient evidence of self-defense or defense of another, "the court has a **sua sponte** duty to instruct on the defense," to "[g]ive bracketed element 3," *and to give "any appropriate defense instructions.  (See CALCRIM Nos. 3470-3477.)*"  (Italics added.)

At defendant's request, the trial court instructed, in the language of CALCRIM No. 3475, on the right to eject a trespasser from real property as related to counts I and III only, the assault and brandishing offenses in the Goodrich incident, as follows:  "The owner of a (home/property) may request that a trespasser leave the (home/property).  *If the trespasser does not leave within a reasonable time* and it would appear to a reasonable person that the trespasser poses a threat to the owner, the owner may use reasonable force to make the trespasser leave.  [¶]  Reasonable force means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.  [¶]  If the trespasser resists, the owner may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.  [¶]  When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable.  If the People have not met this burden, you must find the defendant not guilty" of counts I and III.  (Italics added.)

**Prosecutor's Closing Argument**

Though the court declined to instruct on self-defense, the prosecutor in his closing argument to the jury undertook to explain the court's silence on the issue.  He told the jury that self-defense did not apply and argued:  "In order for a self-defense claim to exist, the Defendant would have to have a reasonable belief that he or someone else was in imminent danger.  [¶]  This is the first reason why self-defense does not apply here.  At

13

no point in any of these instances would a reasonable person in the Defendant's shoes have believed themselves to be in any danger. A snowball fight that you start is not imminent danger. . . . [¶] The second thing, he would have to have a reasonable belief that the immediate use of force was necessary to defend against the danger, imminent danger. And if he doesn't use force, force will be inflicted on him. [¶] It doesn't exist here. No one threatened to use force on this Defendant. There was no force imminent in any of these cases. [¶] The last thing -- and he would need all of these -- the Defendant would have to have used no more force than was reasonably necessary to defend against the danger. [¶] Ladies and gentlemen, if somebody threatens you with a fistfight, you can't pull out a knife and stab them. That is an unreasonable use of force. If somebody threatens you with a fistfight, you can't pick up a baseball bat and swing it at them. Can you punch them? Yes. [¶] You may not exchange a very low level of threatened force with a much greater one. Even in the best case scenario for the Defendant, one instance, it was maybe the threat of a fistfight with Mr. Goodrich that he responded with a nail-studded board. The other instance was a Taco Bell bag. And that's in the light most favorable to him. [¶] None of these elements exist in this case, and that's why you did not get a self-defense instruction because it just simply does not apply. Him saying 'I have the right to defend myself and my wife' doesn't make it so on these facts, because there's another thing. [¶] Here's the law of self-defense. A person cannot provoke a fight or a quarrel just to create an excuse to defend themselves. [¶] Ladies and gentlemen, as you walk out today, I can't push you in the chest and take a swing at you, hoping you swing back so I can beat you up and then say 'Self-Defense. Didn't you see him? He swung at me.' [¶] What did the Defendant do in all of these cases? He provoked these quarrels every single time. This is not a self-defense case. [¶] This is also not a trespasser case. Now, *unlike self-defense*, you did get a *trespasser* instruction. Okay?" (Italics added.)

14

With respect to the trespasser instruction, the prosecutor argued that although defendant and his spouse were within their legal rights to ask a trespasser to leave, the issue was "[w]hen can they use force" to eject the trespasser. (Italics added.) The prosecutor argued, "Here it is. *If the trespasser does not leave within a reasonable time -- that's the key right there in this case -- within a reasonable time* and -- don't miss this 'and -- and it would appear to a reasonable person, not to this guy, to a reasonable person that the trespasser poses a threat to the property or its occupants." (Italics added.) The prosecutor then focused on the short period of time before defendant started yelling obscenities at *all* the victims to leave his property and to assault them (even though the instruction was limited to two counts in the Goodrich incident).

**Defense Counsel's Closing Argument**

Defense counsel argued for acquittal on all crimes, contending that defendant did not commit any crimes. With respect to the Goodrich incident, defense counsel argued that it was "not . . . assault with intent" and waving the stick was not assault with a deadly weapon. With respect to the Enes incident, defense counsel argued the traffic cone was not a deadly weapon that caused serious injury.

**Prosecutor's Rebuttal Argument**

The prosecutor told the jury: "The Defendant didn't throw that cone in order to defend himself or to defend his wife. He threw that cone out of anger, maybe to retaliate for something he perceived that was thrown at him, but he didn't even know what that something was. He told you that. He threw that cone out of anger, *not out of self-defense*, not out of an attempt to use force to eject a trespasser." (Italics added.) The prosecutor argued, "There is no right to self-defense" in the Enes incident and that the cone was "capable of producing" great bodily injury.

**Jury Deliberations**

The jury deliberated for about 11 hours over two days, asking seven questions and making three requests for evidence and copies of the instructions. During deliberations,

15

the jury asked: "If . . . 'acts that are not threatening are not enough to justify assault or battery,' *can we conclude that acts that are threatening are enough to justify an assault and battery*?" (Italics added.) The prosecutor stated the court should instruct that self-defense is not a defense to any of the charges. Over defense counsel's objection, the trial court planned to instruct the jury: "There is no self-defense available in this case, and there are no acts, under the facts that we have, that justify an assault and battery, period." In objecting, defense counsel argued that that was for the jury to decide. The court stated it had already decided that self-defense was not an issue. The court's written response to the jury's question stated: "Self defense is <u>not</u> an issue in this case[.] No acts under these facts justify an assault & or battery."

**Analysis**

"Requested instructions on a defense must be given if they are supported by substantial evidence, rather than 'minimal and insubstantial' evidence. (*People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) Evidence is substantial if a reasonable jury could find the existence of the particular facts underlying the instruction. If the evidence is substantial, the trial court is not permitted to determine the credibility of witnesses, which is a task for the jury. [Citations.]" (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1426.)

" 'To justify an act of self-defense . . . , the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. [Citation.]' [Citation.] The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065, italics omitted (*Minifie*).) " '[A] person in the exercise of her right of self defense not only has a right to stand her ground and defend herself when attacked, but she may pursue her adversary until she has secured herself from danger.' " (*People v. Hatchett* (1942) 56 Cal.App.2d 20, 22; see also CALCRIM No. 3470 ["[A defendant is not required to retreat. He or she

16

is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of (death/bodily injury/_____ <insert crime>) has passed. This is so even if safety could have been achieved by retreating.]"].) The right to use force, however, continues only as long as the danger exists or reasonably appears to exist. (*People v. Martin* (1980) 101 Cal.App.3d 1000, 1010; CALCRIM No. 3474.) "Reasonableness is judged by how the situation appeared to the *defendant*, not the victim." (*Minifie*, *supra*, 13 Cal.4th at p. 1068.)

"As a matter of constitutional due process, the defendant need only raise a reasonable doubt regarding a defense that negates an element of the crime, and in this situation the burden of persuasion is on the People to show the nonexistence of the defense beyond a reasonable doubt. [Citations.] . . . Typically, the prosecution has the burden to prove a defendant did not act in self-defense, because self-defense negates an element of the offense. (See *People v. Rios* (2000) 23 Cal.4th 450, 461-462 [97 Cal.Rptr.2d 512, 2 P.3d 1066] [prosecution must disprove self-defense to prove malice for murder]; *People v. Adrian* [(1982)] 135 Cal.App.3d [335,] 340-341 [prosecution must disprove self-defense to prove unlawful use of force for assault]; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1422–1423 & fn. 2 [32 Cal.Rptr.3d 745] [prosecution must disprove self-defense to prove grossly negligent discharge of firearm].)" (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570-571.)

### The Goodrich Incident

The People argue that defendant was not in danger when he attacked Goodrich. Goodrich's threat to kill defendant was not accompanied by anything demonstrating an intent or ability to carry it out, and Goodrich and Tom were both in the truck when defendant threatened them with the stick with nails. Any belief by defendant that he was in imminent danger of suffering bodily injury was unreasonable, "based on the evidence that he was on the wrong end of a snowball." The People's cleverly phrased argument is plausible; however, the issue for us is not whether the People can frame a tenable

17

argument to refute defendant's claim of self-defense, but whether there is substantial evidence to support the claim. There is.

The snowball fight between these grown-ups added a touch of maudlin humor to the sad events, but according to the evidence, moments before Goodrich and six feet three inch, 250-pound Tom returned to their truck, they had threatened defendant with death and thrown a chunk of ice at him. According to defendant's wife, this caused a concussion. Any threat they posed to defendant was not aborted by their return to the truck.

Goodrich continued threatening to kill defendant even when he spoke to the sheriff's dispatcher. Defendant had the right to stand his ground and defend himself until the threat passed. Whether the danger was over and whether defendant's fear of Goodrich was reasonable were factual questions for the jury, especially in light of the fact that Goodrich threatened to kill defendant throughout—at the beginning of the incident, when defendant told him to leave his property, and at the end, when he told sheriff's dispatch that he had no intention of leaving and that if defendant came back outside, he (Goodrich) was going to kill defendant. Emotions ran high as the events ran their course, and a jury could properly conclude that under the circumstances defendant reasonably believed himself to be in imminent danger of bodily injury. Substantial evidence supported the self-defense instruction with respect to the Goodrich incident.

### *The Enes Incident*

Substantial evidence supported the self-defense instruction with respect to the Enes incident as well. After Jessica screamed profanities at defendant's spouse, Daniel backed up his truck toward Nancy; Jessica rolled her window down and threw an eight and one-half inch by 11-inch bag at Nancy; and defendant, not knowing what was inside the bag, acted within seconds, tossing a traffic cone toward the open window. Defendant testified that he had been carrying the traffic cone to close off the parking lot. He tossed it "just like [he] was throwing horseshoes," within seconds of Jessica's throwing a bag

18

out the window at Nancy's head after calling Nancy a "fucking cunt"; he also testified he did so to protect Nancy from an additional assault. Nancy believed defendant was "[d]efending [her] from whatever else might be thrown out that window."

The People respond that substantial evidence did not support a self-defense instruction because "[t]here was no evidence that [defendant] saw Jessica holding another bag of garbage, or that he saw her make movements that would have led a reasonable person to believe that she was grabbing more garbage" and "[t]here was no evidence of an imminent threat for which an immediate use of force was necessary to defend against." The People claim that defendant used more force than was reasonably necessary to defend.

The People argue that even if the trial court erred in not instructing on self-defense, the error was harmless because there was no evidence of self-defense. The argument is difficult to comprehend but seems to express the self-evident proposition that if there is no evidence to support an instruction, then there would be no evidence to which the instruction could be applied. Such is true but of no consequence in light of our conclusion the instruction was supported by substantial evidence. If defendant's version of the facts is believed, he was confronted with a quickly developing threat and acted immediately to counter it. Under such circumstances, the prescience and restraint demanded by the People's argument is too much to expect. Substantial evidence supported the self-defense instruction. The threat of bodily harm to Nancy was immediate and present. Whether the level of force defendant used was reasonable was a question of fact for the jury.

Substantial evidence supported the self-defense instructions as related to the assault offenses in the Goodrich and Enes incidents. The trial court erred in failing to instruct on self-defense, that is, by failing to include the self-defense element in the assault instructions (CALCRIM Nos. 875, 915, 917) and by refusing to give the self-defense instruction (CALCRIM No. 3470) requested by the defense.

19

*Prejudice*

The failure to instruct was prejudicial. Instructions that omit an element of a charged offense violate a defendant's federal and state constitutional rights to a jury trial. "By relieving the prosecutor of the burden of proving the elements of [assault] beyond a reasonable doubt and depriving defendant[] of a jury trial on [the element of self-defense], these errors contravene both the United States and California Constitutions. [Citations.] To the extent the error implicates federal constitutional rights, our inquiry is governed by the harmless error standard expressed in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*)." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 884; see *Neder v. United States* (1999) 527 U.S. 1, 4, 9-11, 17 [144 L.Ed. 2d 35] (*Neder*); *People v. Aranda* (2012) 55 Cal.4th 342, 367-368 (*Aranda*); *People v. Mil* (2012) 53 Cal.4th 400, 409.)

"Under *Chapman*, a federal constitutional error is harmless when the reviewing court determines 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required. [Citation.] When, in violation of federal constitutional commands, the court's predeliberation instructions have failed to cover the principle that the prosecution must prove the defendant's guilt with respect to each of the charged offenses beyond a reasonable doubt, the effect of such an error is assessed by asking whether there is a reasonable possibility that the verdict in question was not based upon a finding of guilt beyond a reasonable doubt. If, after examination of the record, the reviewing court concludes beyond a reasonable doubt that the jury must have found the defendants' guilt beyond a reasonable doubt, the error is harmless. If, on the other hand, the reviewing court cannot draw this conclusion, reversal is required. [¶] The reviewing court conducting a harmless error analysis under *Chapman* looks to the 'whole record' to evaluate the error's effect on the jury's verdict. [Citation.] We note in this regard that a

20

*Chapman* harmless error analysis for instructional error typically includes review of the strength of the prosecution's case. (See, e.g., *Johnson v. United States, supra*, 520 U.S. at p. 470 [concluding that the trial court's failure to submit the question of materiality to the jury in a perjury case was harmless in light of the overwhelming and uncontroverted evidence supporting that element].) Indeed, the harmless error inquiry for the erroneous omission of instruction on one or more elements of a crime focuses *primarily* on the weight of the evidence adduced at trial. Under *Neder, supra*, 527 U.S. 1, such an error is deemed harmless when a reviewing court, after conducting a thorough review of the record, 'concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citations.]" (*Aranda, supra,* 55 Cal.4th at pp. 367-368.)

We cannot conclude the trial court's failure to instruct that the People were required to prove defendant did not act in self-defense or defense of another was harmless beyond a reasonable doubt. Had the jury been instructed on the element, there is a reasonable possibility the jury would have acquitted defendant of simple assault (the jury acquitted defendant of the charged felony assault). There was substantial evidence of self-defense and defense of another admitted at trial. The issue was contested and hotly disputed. The prosecutor argued to the jury that self-defense did not apply. The jury's question whether the threatening acts were enough to justify an assault or battery showed that it had focused on the amount of force and whether that was reasonable but was told by the court that self-defense was not an issue.

Without jury instructions on self-defense, the jury was left with the instruction on the right of an owner to eject a trespasser, which applied to the Goodrich incident only and did not provide a complete explanation of defendant's right to self-defense.

In view of the absence of any instruction on the element concerning self-defense and the prosecutor's insistence that it did not apply, it is clear that the erroneous

21

instructions contributed to the jury's verdict on the two counts of simple assault (Goodrich and Enes).

**Self-Defense as Related to Brandishing**

With respect to brandishing, the trial court gave bracketed element No. 3 of CALCRIM No. 983, which required the prosecutor to prove that "[t]he defendant did not act (in self-defense/or in defense of someone else)" but refused the requested instruction on self-defense (CALCRIM No. 3470).

The trial court has an affirmative duty to instruct on the applicable law, which includes defenses. (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) Not only did the court not instruct on self-defense, it told the jury in response to a question during deliberations that self-defense did not apply, effectively depriving defendant of his self-defense claim and relieving the prosecutor of his burden to prove an element of the offense.[6]

The jury was given two different instructions—the brandishing instruction, which required the prosecutor to prove that defendant did not act in self-defense or defense of another, and the court's response to one of the jury's questions, which instructed that self-defense did not apply "in this case." "A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." (*Francis v. Franklin* (1985) 471 U.S. 307, 322 [85 L.Ed.2d 344, 358].) Since there is a reasonable possibility that the instructional error contributed to the jury's verdict on brandishing, reversal is required.

**Self-Defense as Related to Vandalism**

With respect to vandalism, defendant argues that acts done in self-defense are lawful and cannot be " 'malicious,' " an element of vandalism. He argues that he struck

---

[6] Given the court's obligation to instruct sua sponte and defendant's request for a self-defense instruction, the People's forfeiture argument is without merit.

the truck with the stick *after* Goodrich threatened repeatedly to kill defendant; Goodrich and Tom exited the truck; six feet three inch, 250-pound Tom hit defendant in the head with the chunk of ice; and Goodrich refused repeatedly to leave the property.

The "malice [element of vandalism] ensures that the act is 'done with a design to do an intentional wrongful act . . . *without any legal justification, excuse* or claim of right.' [Citation.]" (*People v. Atkins* (2001) 25 Cal.4th 76, 88, italics added [discussing whether arson is a general intent crime].) Here the jury was expressly told that self-defense did not apply "in this case" so it had no alternative but to conclude that defendant's act of vandalism was unlawful and thus maliciously done rather than done with legal justification or excuse. As with the assault offenses and brandishing, the instructional error was not harmless beyond a reasonable doubt and reversal is required.

## II

Defendant also contends the trial court prejudicially erred in excluding evidence that defendant had been assaulted by other travelers on prior occasions. We reach the issue because defendant may be retried for the misdemeanor offenses.

Defendant moved in limine to introduce the testimony of several witnesses who would testify they rescued defendant from being attacked or assaulted by unidentified travelers on prior occasions. Defendant also complains that the court would not allow Nancy to testify about prior incidents with travelers and precluded the questioning of Deputy Brown about an assault with a wheelbarrow by a traveler upon defendant the day before the Goodrich incident. Defendant argues that because he had been assaulted on prior occasions by travelers, he had greater reason to fear since he reasonably associated the prior threats and assaults with Enes, Goodrich, and their companions, also travelers. He relies upon *Minifie*, *supra*, 13 Cal.4th 1055 and *People v. Pena* (1984) 151 Cal.App.3d 462 (*Pena*).

*Pena, supra,* 151 Cal.App.3d 462 held that the trial court prejudicially erred in refusing to instruct on the effect of the defendant's knowledge of threats made against

23

him by the victim. (*Id.* at pp. 474-478.) *Minifie, supra*, 13 Cal.4th 1055 held "that evidence of third party threats is admissible to support a claim of self-defense if there is also evidence from which the jury may find that the defendant reasonably associated the victim with those threats." (*Id.* at p. 1060.) " 'A person claiming self-defense is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." [Citation.] The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual. A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence "tend[ing] in reason to prove" that the fear was reasonable. [Citation.] Threats from the group on the defendant's life would certainly tend in reason to make the defendant fearful. This is especially true where the group has a reputation for violence, and that reputation is known to the defendant. Such threats are relevant to the defendant's state of mind—a matter "of consequence to the determination of the action" [citation]—and the trier of fact is entitled to consider those threats along with other relevant circumstances in deciding whether the defendant's actions were justified.' " (*Id.* at pp. 1065-1066.)

Similarly, defendant here was entitled to present evidence of prior assaults by other travelers to assist in establishing his state of mind and the reasonableness of his fear and response in the Goodrich and Enes incidents.

### III

Finally, defendant contends his conviction for disturbing the peace by using offensive language must be reversed because he was exercising his right to free speech and the evidence is insufficient to show his words were likely to evoke a violent reaction. He claims he called Marques a "fucking fat pig" or "fat ass pig," not a "black pig" as

24

Marques claimed. Defendant relies on Nancy's recording of the incident, which was played for the jury.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

To prove the offense of disturbing the peace by using offensive language (§ 415, subd. (3)), the jury was instructed in the language of CALCRIM No. 2690, which required the prosecutor to prove defendant used offensive words that were inherently likely to provoke an immediate violent reaction and that when defendant used those words, he was in a public place. "A person uses offensive words inherently likely to provoke an immediate violent reaction if: [¶] 1. He or she says something that is reasonably likely to provoke someone else to react violently; and [¶] 2. When he or she makes that statement, there is a clear and present danger that the other person will immediately erupt into violence." (CALCRIM No. 2690.)

"Section 415, subdivision (3) codifies the 'fighting words' exception to the right of free speech under the First Amendment of the United States Constitution. 'Fighting words' are ' "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . [S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit

25

that may be derived from them is clearly outweighed by the social interest in order and morality." ' [Citation.] [¶] Whether offensive words uttered in a public place are inherently likely to provoke an immediate violent reaction must be decided on a case-by-case basis. '[T]he mere use of a vulgar, profane, indecorous, scurrilous, opprobrious epithet cannot alone be grounds for prosecution . . . .[¶] *The context in which the words are used must be considered, and there must be a showing that the words were uttered in a provocative manner, so that there was a clear and present danger violence would erupt*.' [Citation.]" (*In re Alejandro G.* (1995) 37 Cal.App.4th 44, 47-48, italics added.)

Here, Marques testified about stopping in the parking lot of defendant's restaurant because his baby was ill and going inside the restaurant to ask for some paper towels. Meanwhile, defendant and his dog were outside in the parking lot. Defendant was yelling at Thy, and the dog appeared aggressive to her. When Marques left the restaurant, he saw that Thy was upset. According to Marques, defendant and Nancy were calling Marques's family a "bunch of pigs," and defendant called Marques a "black pig."

The jury heard defendant testify and dispute what he had said to Marques, claiming he only called Marques a "[f]at ass pig" or a "fucking fat pig." The jury resolved the conflicting evidence against defendant and found that whatever defendant said, whether "fucking fat pig" or "fat ass pig" or "black pig," was likely to provoke an immediate violent reaction in view of the context in which it was said, that is, the hostile, aggressive, and hateful behavior of both defendant and Nancy. Sufficient evidence supports defendant's conviction for disturbing the peace by using offensive language (count V).

**DISPOSITION**

Defendant's convictions for misdemeanor assault, the lesser included offense to both counts I and IV; misdemeanor vandalism (count II); and misdemeanor brandishing (count III) are reversed. Defendant's conviction for misdemeanor disturbing the peace (count V) is affirmed. Given that defendant was found not guilty of the felony offenses

26

charged, the on-bail enhancement cannot be imposed.  (*People v. Adams* (1993) 6 Cal.4th 570, 582.)  The matter is remanded to the trial court for further proceedings.


                RAYE         , P. J.


We concur:


      NICHOLSON     , J.


      ROBIE         , J.