Filed 3/17/15  P. v. Donald CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NICKIE ALLEN DONALD,<br><br>        Defendant and Appellant. | A139326<br><br>(Contra Costa County<br>Super. Ct. No. 51207059) |

Defendant Nickie Allen Donald appeals from a judgment convicting him of, among other things, first degree murder and attempted murder. He contends the court erred in instructing the jury regarding imperfect self-defense, by allowing the introduction of improper character evidence, and in certain other respects we shall discuss below. We conclude there were no prejudicial errors and shall affirm the judgment.

**Factual and Procedural History**

Defendant was charged with one count of murder (Pen. Code, § 187);[1] one count of attempted murder (§§ 187, 664); one count of shooting at an occupied motor vehicle (§ 246) and one count of shooting from a motor vehicle (§ 12034, subd. (d).). The indictment also alleged in connection with all counts that defendant personally used a firearm (§ 12022.53) and committed the offenses to benefit a street gang (§ 186.22).

---

[1] All statutory references are to the Penal Code unless otherwise noted.

The following evidence was presented at trial:

Around 10:00 p.m., on June 25, 2010, Asama Ayyad and Odey Saeidah were driving in a white Lexus with tinted windows on Bissell Avenue in Richmond, California. While at the intersection of Bissell and 22nd Street, Saeidah, the passenger, looked in the right side view mirror and noticed a white van approach. The van pulled up on the passenger side of the Lexus. Saeidah saw an African-American male in a white t-shirt "hanging out of the window." The man suddenly started shooting into the passenger-side window with a semi-automatic handgun. The window was rolled up when the shooting began. The van was slowly moving forward as the driver shot into the Lexus. As Ayyad drove away, the man in the van kept shooting at their car.

Saeidah was shot in the thigh and the bullet passed entirely through his leg. Ayyad had been shot in the right side of his body. Although he was able to drive a short distance, he soon fainted and the car crashed into a light pole. Saeidah testified that neither he nor Ayyad was carrying a gun and they did not do anything to provoke the shooting. Ayyad died that evening of a gunshot to the chest.

Arei Lewis was riding in the van with defendant and four other men at the time of the shooting. There were three rows of seats in the van, and Lewis was riding in the rear seat. Defendant was driving. As they approached the intersection of 23rd and Bissell, Lewis heard someone in the van say, "Is that the same car from earlier?" The men were referring to a Lexus coupe stopped at the light. Then, someone asked whether there was a gun in the car. Lewis heard the men talking, and a gun was passed up to defendant from the middle seat. When the light changed, defendant made a left on to Bissell to follow the Lexus. Defendant stopped at the intersection of 22nd and Bissell beside the Lexus. A few seconds later, defendant fired six or seven gunshots into the Lexus. He handed the gun back to one of the other men and drove from the scene.

Richmond Police Officer Miles Bailey was on patrol in the area when he heard multiple gunshots. He drove in the direction of the gunshots and within a minute after the shots were fired he saw defendant's van travelling away from the scene of the shooting at

2

a high rate of speed. The officer followed the van and activated his overhead lights and siren.

Within seconds of the shooting, Lewis heard police sirens. She heard the men talk about getting rid of the gun and heard one of them say, "Get the shells out of the car. Get the shells out of the car." One of the men rolled down his window and threw the gun out of the car into some bushes or trees. The men started taking money from the front seat and putting it into Lewis's purse. They told her to act like she was asleep.

When defendant pulled over, the police officer ordered everyone out of the van. The officers went through Lewis's purse and found the money that had been passed back to her. Initially, Lewis told the police that one of the other men, not defendant, was the shooter. When the officers confronted her with conflicting evidence, she acknowledged that defendant fired the gun. Lewis told them where the gun had been thrown and pointed out the location of the shooting. Lewis told the police that she was afraid to testify about the incident, and she expressed concern for her family's safety. Her purse was taken from her that night, and she subsequently began to receive calls and text messages telling her that she must return the money because defendant needed it for his lawyer. The threatening text messages were provided to the police and their content admitted at trial. On cross-examination, Lewis acknowledged that she was smoking marijuana in the van prior to the shooting.

Police Detective Avon Dobie testified that when he interviewed Lewis shortly after the shooting she reported hearing the men say "There goes that white car" or "There goes that white coupe" and someone else said, "We need to follow—we need to get that car." Officers recovered a .40-caliber semi-automatic handgun in the shrubbery near where the van was pulled over. Bullets removed from the Lexus and Ayyad's body were consistent with the gun, but there were insufficient markings to determine whether they were actually fired from that gun.

Defendant testified that prior to the shooting he had taken two Valium pills, four Ecstasy pills, and drank "bo," a mixture of promethazine and codeine. He testified that just prior to the shooting, he noticed that someone behind him was driving close to him

3

and had their high-beam headlights on. He did not say anything to the others in the car because he did not want them to think he was having a panic attack for no reason, but he did circle around the block. As he turned from 23rd onto Bissell, he heard someone in the van mention a white car. When he saw the white car pulling up alongside them on Bissell, he asked the others if there was a gun in the car and someone passed him a gun. Defendant admitted that he fired the gun at the white car, "one shot after the other." His sole testimony as to why he fired the gun was as follows: "Q. Why did you shoot the gun? A. Because I panicked."[2]

Presumably in explanation of why he "panicked," defendant presented evidence that he had been shot by people riding in white cars on three separate occasions in the prior six months and he testified that he was anxious about seeing white cars. Defendant's uncle testified that defendant was shot in December 2009 by someone in a large "beige-ish white" four-door sedan. The car passed by their residence slowly and then returned and stopped in front of house. There were three or four people in the car at the time. Defendant was standing in the driveway near the porch when he was shot. Defendant testified that as a result of the shooting he "had a lot of sharp pain shooting through [his] head and headaches, migraines, things like that." He testified that he had anxiety after being shot. Asked what he was anxious about, he responded, "I don't like seeing white cars and I continue to hear multiple gunshots going off in my head."

Defendant also testified that in May 2010 he got into a shootout with two Miles brothers driving a white Camry. He claimed that he had a long-standing dispute with the brothers and they drove by his house and started shooting. He shot back, but his gun jammed. Testimony was presented that one of the brothers claimed that defendant began shooting at their car first and kept shooting until his gun jammed.

_____

[2] Shortly after this answer, on direct examination, defendant was asked whether he saw the passenger window of the white car was "cracked," i.e., lowered, when he fired the gun, and he answered, "I couldn't really get a view because it happened too quick." On cross-examination, he testified that someone in the van had yelled "the window was cracked." He took it as "it [the window] was going down."

Finally, defendant testified that in early June 2010, he was again shot at by two people driving in a white, two-door Lexus. He did not know who the men were because they were wearing hats and he did not get a good look at them.

Defendant's cousin also testified that defendant was afraid of white cars. He was particularly scared when he saw white Lexus coupes. He testified that if he and defendant were driving and they saw a white Lexus coupe, the cousin would "try to make sure that the car would be on my side instead of being on [defendant's] side . . . to make him feel more protected. So I would necessarily get shot instead of him."

Expert psychologist Andrew Pojman testified that defendant has post-traumatic stress disorder and that people with the disorder often respond to visual cues associated with a past trauma with an exaggerated fight or flight response.

Defendant was found guilty of first degree murder, attempted murder, shooting at an occupied motor vehicle, and shooting from a motor vehicle. The gang allegations were found not true but the firearm allegations were found true. Defendant was sentenced to an aggregate term of 77 years and four months to life in prison.   Defendant filed a timely notice of appeal.

**Discussion**

1.      *Defendant was not prejudiced by the jury instructions on imperfect self-defense.*

The jury was instructed, pursuant to CALCRIM No. 571 as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those

5

beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] *If you find that the defendant received a threat from someone else that he reasonably associated with Asama Ayyad, you may consider that threat in evaluating the defendant's beliefs. . . .*" (Italics added.)

The jury was instructed, pursuant to CALCRIM No. 604, with the parallel imperfect self-defense instruction for attempted murder.

Defendant contends these instructions improperly require that he "have 'reasonably' associated a prior threat by someone else with the victims . . . in order to consider the threat in evaluating imperfect self defense." Although the instructions given were taken directly from the standard CALCRIM instructions, and no objection to them was made in the trial court, defendant now argues that evidence of third party threats may support a claim of imperfect self defense if there is evidence that "the defendant actually, even if unreasonably, associated the victim with those threats." His contention is supported by dictum in *People v. Minifie* (1996) 13 Cal.4th 1055, 1061-1063, 1069. In that case the court held that the defendant should have been allowed to present evidence that he had received numerous threats on his life from specific third-parties, and in dictum "note[d] that this case involves an assault, not a homicide, and thus no question of *imperfect* self-defense is presented. [Citation.] To support a claim of imperfect self-defense, evidence of third party threats may also be admissible if there is evidence the defendant actually, even if unreasonably, associated the victim with those threats." (*Id.* at p. 1069; see also *People v. Mills* (2012) 55 Cal.4th 663, 678-679, fn. 10.)

Even assuming that the issue may be considered on appeal despite the failure to have objected in the trial court, and that the *Minifie* dictum correctly states the law, the failure to give the correct instruction in this case clearly was not prejudicial. Although the jury was instructed on imperfect self-defense, the defendant's defense at trial was complete self-defense, not imperfect self-defense. That was defendant's contention in the opening and closing statements and throughout the trial. Moreover, defendant's evidence

6

failed to lay a foundation for imperfect self-defense. Defendant did not testify that the reason he fired shots at the victims' car was that he thought someone in the car was about to shoot him; his only testimony was that he "panicked." Even assuming that the testimony of prior shootings by people in a white car would support the inference that he feared that those people were in the white Lexus coupe, he testified that he did not see who those people were and did not know who they were. Asked whether he thought the Lexus coupe could have been the car of the Miles brothers, with whom he testified to a prior exchange of gunshots, he responded "I wasn't sure." Defendant also testified that he did not see that the window of the Lexus was lowered (although on cross-examination he added that someone in the van had yelled that the window was "cracked"), and he certainly did not testify that he believed he would be shot from the other car if he did not fire first. Defense counsel did not even argue imperfect self-defense in closing argument, focusing entirely on complete self-defense. Finally, viewing the record as a whole, there is no likelihood that a correct instruction on third-party threats would have resulted in a more favorable outcome for defendant. In contrast to defendant's testimony that he panicked when he observed the white Lexus approach his van from behind, there was overwhelming testimony from numerous witnesses that it was the van that pulled up beside the Lexus, leading to the unprovoked shooting. And the prosecutor's cross-examination brought out numerous inconsistencies in defendant's testimony and repeated admissions of past lies. An instruction to the jury that a belief that the persons in the white car were the prior shooters need not have been reasonable undoubtedly would not have changed the outcome of trial.

2.      *Defendant was not prejudiced by the jury instructions on voluntary intoxication.*

As noted above, evidence was introduced that defendant may have been intoxicated at the time of the shooting. With regard to voluntary intoxication, the jury was instructed, pursuant to CALCRIM No. 625, as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the

defendant acted with deliberation and premeditation. [¶] . . . [¶] You may not consider evidence of voluntary intoxication for any other purpose." Defendant did not request any additional instructions on voluntary intoxication, but argues on appeal that this instruction "erroneously and unconstitutionally" precluded jurors from considering defendant's intoxication in deciding if defendant actually but unreasonably believed he was in imminent danger and needed to use deadly force to protect himself. We disagree.

The parties argue extensively about whether voluntary intoxication may be considered by the jury in evaluating a defendant's subjective belief in the need to defend. However, we need not be drawn into this dispute because there is no likelihood the instruction, even if erroneous, was prejudicial. The evidence of defendant's intoxication was relatively limited and voluntary intoxication was not raised by defense counsel in closing argument. [3] While defendant testified to his use of drugs and alcohol before getting in the van, he also testified that he told the police following his arrest that he was not too intoxicated to drive. Having found defendant guilty of first degree murder, the jury necessarily found that defendant's intoxication was not to such a degree that it interfered with his formation of the intent to kill or premeditation and deliberation. [4]

---

[3] In closing argument, the prosecution argued, "I expect that you're going to hear some argument from [defense counsel] about voluntary intoxication. And the court will instruct you on that as to which crimes and which elements of which crimes you may consider that. And, as to the other elements that are not specifically listed in the instruction, you may not consider voluntary intoxication as a defense." Defense counsel did not, however, discuss voluntary intoxication in his closing argument.

[4] The jury was instructed on first degree murder pursuant to CALCRIM No. 521 in relevant part as follows: "The defendant has been prosecuted for first degree murder under two theories: (1) 'the murder was willful, deliberate, and premeditated' and (2) 'the murder was committed by shooting from a vehicle.' [¶] Each theory of first degree murder has different requirements, and I will instruct you on both. [¶] . . . [¶] A. Deliberation and Premeditation [¶] The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] . . . [¶] G. Discharge From Vehicle

8

Finally, the prosecutor made no specific statement suggesting the jury could not consider intoxication when evaluating defendant's subjective state of mind in connection with imperfect self-defense. The imperfect self-defense instructions explicitly told the jury to consider all the circumstances from the defendant's perspective when determining defendant's subjective beliefs, stating: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant." (CALCRIM No. 571.) These circumstances presumably would include evidence that defendant's perceptions were affected by his drug and alcohol use. There is no probability that the outcome would have been different if the jury had been provided an additional instruction directed explicitly to the use of the intoxication evidence in considering voluntary manslaughter.

3.    *The court did not err in defining "reasonable person" for the jury.*

In his closing argument, the prosecutor argued as follows: "Now, the reasonable person is not the reasonable gang member. . . . You hear this term in the law a lot. There's no set definition of what a reasonable person is. But I can tell you a few things that the reasonable person is not. . . . [A] reasonable person does not suffer from any form of mental illness. A reasonable person is not under the influence of controlled substances. And as I said before, the reasonable person is not part of a gang. [¶] . . . [¶] A reasonable person who is not mentally ill, who is not impaired, who is not in a gang, who is not someone who has chosen to go and get into shootouts with people, that person would not do the actions that the defendant did. And again, to the extent they're now looking to that standard to say a reasonable person would have done those things, he falls short. He cannot now rely on these things he claims to be part of his life story, his mental illness,

---

[¶] The defendant is guilty of first degree murder if the People have proved that the defendant murdered by shooting a firearm from a motor vehicle. The defendant committed this kind of murder if: [¶] 1. He shot a firearm from a motor vehicle; [¶] 2. He intentionally shot at a person who was outside the vehicle; [¶] AND [¶] 3. He intended to kill that person."

his drug use, and his gang affiliation. He cannot use that to say that a reasonable person would have done what he did on that night."

During deliberations, the jury asked: "Is there a jury instruction defining the term reasonable &/or reasonable person. We're not able to find it. Is [the prosecutor's] definition correct?" The court responded: "Please clarify as to your specific request regarding 'reasonable person.' We are unclear on your question."
The jury then asked: "We did not find in the jury instruction packet a definition of either 'reasonable' or 'reasonable person.' We are wondering if the court read one to us, but we didn't get it. A related question is whether [the prosecutor] was reciting a specific binding definition when he wrote [*sic*] what a reasonable person is, i.e., not a gang member, not a person with mental illness & not a person who is intoxicated." Relying on *People v. Jefferson* (2004) 119 Cal.App.4th 508, 519, the court responded to the jury note as follows: "The law defines a reasonable person as an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be."

Defendant contends that the prosecutor misstated the law and the trial court erred in responding to the jury's question, giving the jury an erroneously narrow "reasonable person" standard. We disagree.

In determining whether a defendant's belief in the need to defend himself is objectively reasonable, "a jury must consider what would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant. . . .' [Citation.] To do this, it must consider all the ' " 'facts and circumstances . . . in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety.' " ' [Citation.] As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083 [Evidence of battered women's syndrome is relevant, and, thus, admissible to establish defendant's situation and knowledge for purposes of

10

self-defense.].) As the court in *Humphrey* noted, however, "we are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard. Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' . . . The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the *jury*, not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable." (*Id.* at p. 1087.)

The prosecutor's argument that a reasonable person is not a reasonable gang member or one who is suffering from mental illness or is under the influence of controlled substances was not, as defendant suggests, a misstatement of the law. (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1087; *People v. Jefferson*, *supra*, 119 Cal.App.4th at p. 519 ["By definition, a reasonable person is not one who hears voices due to severe mental illness."]; *People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253 ["Defendant's evidence that he was intoxicated, that he suffered various mental deficiencies, that he had a psychological dysfunction due to traumatic experiences in the Vietnam War . . . may have satisfied the subjective element of heat of passion. [Citation.] But it does not satisfy the objective, reasonable person requirement, which requires provocation by the victim."].) Likewise, the court's response to the jury was an accurate statement of the law taken verbatim from *People v. Jefferson*, *supra*, 119 Cal.App.4th at page 519. It was not, as defendant suggests, too narrow, particularly because the jury was instructed, pursuant CALCRIM No. 505, that in deciding whether defendant's actions were reasonable it must consider "all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed."

11

4.	*The court did not err in allowing defendant's character witnesses to be questioned regarding separate murder charges filed against defendant in Marin County.*

Prior to trial, defense counsel moved to exclude evidence of any prior alleged criminal acts or uncharged misconduct by defendant, including a homicide alleged to have occurred in Marin County on November 30, 2009. The prosecutor at that time indicated that he was not planning to introduce reports from the Marin County case. However, the issue did arise a number of times during trial.

First, on cross-examination, the prosecution gang expert was asked what documents he reviewed in coming to his conclusions about defendant's gang membership. He explained that he had testified in a case in Marin County involving defendant. Defense counsel asked the expert, "This time that you testified in Marin about Nickie Donald, that case was eventually dismissed against Nickie Donald, correct?" The expert responded, "I don't know the exact disposition of that case. I'm not sure." Thereafter, defense counsel made a motion for a mistrial because the prosecutor had agreed not to introduce such evidence and the prosecution expert should have known not to refer to the matter. The prosecutor noted that the matter had been addressed in a sidebar conference and that the witness did his best to avoid going into improper matters. The court agreed that the matter was discussed at the bench and that it had suggested that defense counsel narrow his cross-examination "because it was so open-ended that I thought the inspector had no choice but to answer in the way he did." The court continued, "You [defense counsel] did not want to narrow the focus because then you thought the jury might think that there were other matters in other counties and it would be worse that way. . . . [Y]ou said you were going to go into the matter anyway because the case had been dismissed." The court concluded that any error was invited, and denied the motion for a mistrial. The court also noted that defense counsel had declined a curative instruction.

Later, before defendant's character witnesses testified, the prosecution indicated that the Marin case could potentially come up again during the cross-examination of defendant's character witnesses "if they're saying he's this gentle person who would

12

only, you know, act . . . to protect himself or to protect others." The trial court agreed that if the witnesses were to testify to defendant's good character, that would "open the door to have you heard type questions."

Thereafter, Lisa Wilson, defendant's former foster mother, testified that defendant "was a good kid . . . He was good in school, had good grades, played football, did wonderful." She never saw him with any guns or being violent to anyone. When she heard that he had been charged with murder in this case she was "surprised and still is surprised because he wasn't that type of kid." On cross-examination, Wilson testified that after she moved from Richmond in 2007, she had less direct contact with defendant. She explained, "my daughter kept more contact with [him] than I did. I always checked on them, but they had more . . . ." When asked whether she had heard or was she aware "that there was a separate arrest for murder in Marin County where Mr. Donald was prosecuted for a completely separate incident from 2009," she responded "no." She indicated that this was the first time she had heard about the additional murder charge in Marin. Wilson was surprised to hear that "something else happened." Shortly after the above questioning, the trial court instructed the jurors as follows: "Ladies and gentlemen, I want to caution you about the testimony you've just heard or the questions and answers you've just heard. The questioning is in order to find out whether or not Ms. Wilson's opinion would change about the defendant if she knew about another incident. It is not offered for the truth of the incident. It's simply offered to see if her perspective about him has changed. So I want to make sure that everybody understands that. It's a limited purpose."

On appeal, defendant does not challenge the trial court's ruling with respect to the testimony of the prosecutor's gang expert, but contends that the court erred allowing the prosecutor to question Wilson about the Marin murder charge. Defendant does not dispute that "[w]hen a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony." (*People v. Wagner* (1975) 13 Cal.3d 612, 619 ["The rationale allowing the prosecution to ask such questions (in a 'have you heard' form) is that they test the witness' knowledge

13

of the defendant's reputation."].) He argues, however, where the witness's opinion of the defendant is based solely on personal knowledge and not reputation, such questions do not serve the rationale of the rule and should not be permitted. (See *People v. Hurd* (1970) 5 Cal.App.3d 865, 879-880, superseded by statute as stated in *People v. Tobias* (2001) 25 Cal.4th 327, 332 [Defendant's argument that the "rationale does not apply where, as here, the good-character witness does not testify to defendant's reputation but states his opinion of defendant's character" is not "without some logic" but finding no error because in that case, as "[i]n many instances, the opinion of a personal acquaintance will necessarily be based upon a mixture of personal knowledge or observation of the defendant and a knowledge of his reputation in the community."].)

As in *Hurd,* the factual predicate for defendant's argument is not supported by the record. Wilson's testimony that defendant was a good kid was based both on her personal experience with him as his foster parent and on what she had learned by checking on him through his relationship with her daughter. Her opinion necessarily was based upon both personal knowledge and reputation. The murder did not take place "long after the period she testified about," as suggested by defendant. Wilson testified that she had less contact with defendant after she moved in 2007 and that the last time she saw defendant in person was about a year before his arrest in June 2010. She apparently had heard nothing in that time that had changed her opinion of defendant as not the "type of kid" to commit such a crime because she was "surprised" by both the present charges and the Marin charge. In any event, in light of the court's clear admonition, it is not reasonably probable the jury would have reached a more favorable verdict had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Frank* (1990) 51 Cal.3d 718, 728 [jurors are presumed to follow the court's limiting instructions].) The fact that the jury found the gang enhancement allegations not true strongly suggests that it was not biased against defendant based on the testimony about the Marin case. (Cf. *People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1312 ["that

14

defendant was acquitted of *any* of the offenses suggests the lack of prejudice and the jury's clear ability to consider each count on the evidence prescribed and nothing else"].)[5]

5.     *No cumulative error or prejudice requires reversal.*

Defendant contends his conviction must be reversed because the errors complained of above, when combined, violated his right to due process by rendering his defense of imperfect self-defense "far less persuasive than it might otherwise have been." He argues, "In this case, two of the trial court's instructional errors combined to prejudice the jury's consideration of imperfect self defense by effectively excluding two important factors from the jurors' analysis: Donald's association of Ayyad and Saeidah with the people who had previously shot him from a white car, and Donald's intoxication. The third instructional error prejudiced the jurors' consideration of both self defense and imperfect self defense by unduly narrowing the definition of a 'reasonable person.' Finally, the court's error in allowing the prosecution to ask a defense character witness about another murder Donald had been charged with in Marin County further prejudiced the jury's consideration of both self defense and imperfect self defense. The suggestion that Donald had committed another murder threatened to cloud the jury's consideration of self defense and imperfect self defense." As discussed above, however, we find no error with respect to the trial court definition of a "reasonable person" or with the admission of the character evidence. The potentially inaccurate instructions, both of which were highly tangential to the key issues in this case, similarly do not require reversal of defendant's convictions. In light of the overwhelming evidence of defendant's guilt and the complete absence of any credible evidence supporting an actual belief by defendant that he was in *imminent* danger of being killed or suffering great bodily injury, or that the immediate

---

[5] For the same reason, we reject defendant's related contention that the court erred in allowing the prosecution to cross-examine defendant's gang expert regarding the Marin case. After establishing that the expert was aware of the Marin case but had not read the reports, the expert answered affirmatively to the prosecutor's question whether, even if the charges were dismissed, the incident would "still be significant . . . [to] a person's gang affiliation?" Any potential error in admitting this testimony was harmless under any standard.

15

use of deadly force was necessary to defend against the danger, there is no likelihood that the instructional errors complained of were prejudicial.

## Disposition

The judgment is affirmed.


_____
Pollak, J.


We concur:


_____
McGuiness, P. J.


_____
Siggins, J.